568 So.2d 891 (1990)
James Aren DUCKETT, Appellant,
v.
STATE of Florida, Appellee.
No. 72711.
Supreme Court of Florida.
September 6, 1990.
Rehearing Denied November 14, 1990.
Jack T. Edmund, Fort Meade, for appellant.
Robert A. Butterworth, Atty. Gen., and Kellie A. Nielan, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
James Aren Duckett appeals his convictions of sexual battery and first-degree murder and his sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm.
*892 The facts in this opinion are set forth in extensive detail since the convictions are based on circumstantial evidence. Duckett, a police officer for the City of Mascotte, was the only officer on patrol from 7:00 p.m., May 11, 1987, to 7:00 a.m., May 12, 1987. Between 10:00 and 10:30 p.m. on May 11, Teresa McAbee, an eleven-year-old girl, walked a short distance from her home to a convenience store to purchase a pencil. Teresa left the store with a sixteen-year-old Mexican boy, who was doing laundry next door. The boy testified that they walked over to the convenience store's dumpster and talked for about twenty minutes before Duckett approached them. A clerk at the convenience store testified that Duckett entered the store and asked her the girl's name and age, at which time she advised him that Teresa was between ten and thirteen years old. After indicating that he was going to check on her, Duckett exited the store and walked toward the dumpster, where he located the two children. Duckett testified that he conversed with the children and subsequently, acting in his capacity as a police officer, instructed Teresa to return home. The sixteen-year-old boy testified that, after speaking with Duckett, he went to the laundromat to wait for his uncle, who arrived soon thereafter; that Duckett and Teresa were standing near the patrol car; and that Duckett asked the uncle the nephew's age. Subsequently, Duckett suggested that the uncle talk to his nephew while he spoke to Teresa. According to the uncle and the boy, Duckett placed Teresa in the passenger's side of his patrol car and shut the door before proceeding to the driver's side. The uncle also testified that he never saw Teresa touch the hood of Duckett's car.
At approximately 11:00 p.m., Teresa's mother walked to the convenience store, searching for her daughter. Upon arrival, she was told by the store's clerk that Duckett may have taken her daughter to the police station. The mother then left the store and spent about an hour with her sister driving around Mascotte in search of Teresa. During this time, the mother did not see a police car. She next went to the Mascotte police station and, finding no one there, she drove a short distance to the Groveland police station. There, she told an officer that she wanted to report her daughter as missing. The officer told her that he would contact a Mascotte officer to meet her at the Mascotte police station. Teresa's mother returned to the Mascotte police station and waited for fifteen to twenty minutes before Duckett arrived. After arriving, Duckett told her that he had spoken with Teresa at the store; that she had been in his police car; and that he had directed her to return home. Before returning home, the mother also filed a missing person report with Duckett. Subsequently, Duckett went to the mother's residence to get a picture of her daughter, called the police chief to inform him of the missing person report, and advised the police chief that he had made a flyer and did not need any help in the matter. Duckett then returned to the convenience store with a flyer but told the clerk not to post it since it was not a good picture. Although he told the clerk that he would return with a better one, he never did. Duckett did bring flyers to two other convenience stores. The clerk at one of these stores testified that, while the police usually drove by every forty-five minutes to an hour, Duckett came by at 9:30 p.m. but failed to return until he brought the flyer later that evening. A tape of Duckett's radio calls indicated none between 10:50 p.m. and 12:10 a.m. At 1:15 a.m., Duckett went to the uncle's house to question his nephew about Teresa, and Duckett returned to the mother's home around 3:00 a.m.
Later that morning, a man saw what he believed to be a body in a lake and went to find the police chief, who determined that it was Teresa's body. The lake is less than one mile from the convenience store where Teresa was last seen.
A medical examiner testified that the perpetrator had sexually assaulted the victim while she was alive, strangled her, and then drowned her, causing her death. Prior to this incident, the victim had not engaged in any sexual activity. Blood was found on her underpants but not in or *893 about Duckett's patrol car. Semen was discovered on her jeans.
A technician for the sheriff's department examined the tire tracks at the murder scene and indicated that they were very unusual. While leaving the crime scene, he observed that the tracks of a Mascotte police car appeared to be similar. He stopped his vehicle, examined the tracks, and determined that they were consistent with the tracks at the crime scene. An expert at trial corroborated this evaluation. The tracks were made by Goodyear Eagle mud and snow tires, which are designed for northern driving. While the local tire center had not sold any of those particular tires during its nine years of existence, it had received two sets by mistake and placed them on the two Mascotte police cars.
Evidence revealed that the vehicle which left the impressions had driven through a mudhole. However, no evidence was presented that Duckett cleaned his vehicle, and no debris from the scene was found in or on his vehicle. Evidence was also presented that Duckett was neat and clean later that night, as if he had just come on duty.
Both Duckett's and Teresa's fingerprints were discovered on the hood of Duckett's patrol car. Duckett's prints were commingled with the victim's, whose prints indicated that she had been sitting backwards on the hood and had scooted up the car.
A pubic hair was found in the victim's underpants. While other experts could not reach a conclusion by comparing that hair with Duckett's pubic hair, Michael Malone, an FBI special agent who had been qualified as an expert in hairs and fibers in forty-two states, examined the hair sample, concluding that there was a high degree of probability that the pubic hair found in her underpants was Duckett's pubic hair. Malone also testified that the pubic hair did not match the hairs of the sixteen-year-old boy, the uncle, or the others who were in contact with the victim that evening.
On June 15, 1987, before his arrest, Duckett gave a statement in which he denied driving his vehicle to the lake that evening. He further stated that the victim had not been on the hood of his patrol car and that he had stopped at the Jiffy store for coffee after the girl went home.
The state presented testimony of three young women who allegedly had sexual encounters with Duckett. Prior to the introduction of this testimony, the trial judge instructed the jury that the testimony was for the limited purpose of showing motive, opportunity, plan, and identification. The first woman, a petite nineteen-year-old, testified that, in either January or February, 1987, she ran into Duckett while she was attempting to find her boyfriend. After indicating that he, too, was searching for her boyfriend, he drove her in his patrol car in search of her boyfriend. While in the car, Duckett placed his hand on her shoulder and attempted to kiss her. After she refused to kiss him, he desisted and she got out of the car. The second woman, a petite eighteen-year-old, stated that, on May 1, 1987, Duckett picked her up while she was walking along the highway. After Duckett drove her to a remote area in an orange grove, he parked the car, placed his hand on her breast, and attempted to kiss her. When she refused to kiss him, he desisted and drove her to where she requested. The third woman, a petite seventeen-year-old, testified that on two occasions, once in February or March, 1987, and again in April or May, 1987, she voluntarily met Duckett at a remote area while he was on patrol and performed oral sex on him.
At trial, Duckett testified that, on the night of the murder, while running stationary radar near the convenience store, he noticed a girl talking to three Mexicans at a laundromat. After he saw the girl and one of the boys walk over to an ice machine, he went into the store to ask the clerk some questions about the girl. He then left the store, asked the children their ages, requested that they walk to his car, and questioned the boy further. At this time, the boy's uncle arrived at the scene with some other men. Subsequently, Duckett placed the girl in his car while he spoke with the uncle about his nephew. After the boy's uncle left with the other men, *894 Duckett obtained more information from Teresa and told her to go home. He did not see her again after she got out of the car and walked in front of the store.
Duckett also stated that he then returned to the station for a short period of time, went to one of the convenience stores for coffee, and went on patrol. He subsequently responded to a call by a Groveland police officer and returned to the station in Mascotte, where he met the girl's mother. After visiting the uncle's home to ask some questions concerning the girl, he drove to the mother's home to get a picture. He then returned to city hall, called the police chief, and told him he was going to make a poster and contact all the stores.
With regard to Teresa's fingerprints on the hood of his car, he explained that it was possible that she sat on the hood when he was at the convenience store. Duckett denied any involvement with the three women.
The jury found Duckett guilty of sexual battery and first-degree murder. In the penalty phase, the state presented no additional testimony and Duckett presented the testimony of four witnesses. By an eight-to-four vote, the jury recommended a death sentence. The trial judge found two aggravating circumstances, specifically, that the murder was committed during the commission of or immediately after a sexual battery and that the murder was especially heinous, atrocious, or cruel. The trial judge found the existence of one statutory mitigating circumstance, namely, that Duckett had no significant history of prior criminal activity. The trial judge also determined that Duckett's family background and education gave rise to nonstatutory mitigating evidence. After making these findings, the trial judge imposed the death sentence, concluding that the aggravating circumstances outweighed the mitigating circumstances, and sentenced Duckett to life imprisonment for the mandatory minimum of twenty-five years for the sexual battery conviction.
In this appeal, Duckett raises the following issues: (1) whether the trial court erred in denying his motion for a judgment of acquittal based on his claim that the circumstantial evidence did not exclude all reasonable hypotheses of innocence; (2) whether the trial court erred in admitting the testimony of the three female witnesses under the Williams rule;[*] (3) whether the trial court erred in qualifying Michael Malone as an expert in the field of hair analysis; and (4) whether the trial court erred in imposing the death penalty.
In his first point, Duckett asserts that the evidence was subject to two reasonable constructions, one consistent with guilt and the other consistent with innocence. Because this cause involves solely circumstantial evidence, the following well-established standard must be applied:
[O]ne accused of a crime is presumed innocent until proved guilty beyond and to the exclusion of a reasonable doubt. It is the responsibility of the State to carry this burden. When the State relies upon purely circumstantial evidence to convict an accused, we have always required that such evidence must not only be consistent with the defendant's guilt but it must also be inconsistent with any reasonable hypothesis of innocence.
Davis v. State, 90 So.2d 629, 631 (Fla. 1956) (citations omitted); see also Cox v. State, 555 So.2d 352 (Fla. 1989); Thomas v. State, 531 So.2d 708 (Fla. 1988); McArthur v. State, 351 So.2d 972 (Fla. 1977). Consequently, the state has the burden to prove that the evidence presented is inconsistent with any reasonable hypothesis of innocence. The state contends that it has satisfied its burden of proof. We agree, concluding that the following facts satisfy the test in Davis: (1) the victim was last seen in Duckett's patrol car; (2) the tire tracks at the murder scene were consistent with those from Duckett's car; (3) no one saw Duckett, the only policeman on duty in Mascotte, from the time he was last seen with the victim until the time he met the *895 victim's mother at the police station; (4) numerous prints of the victim were found on the hood of Duckett's patrol car, although he denied seeing her on the hood; (5) a pubic hair found in the victim's underpants was consistent with Duckett's pubic hair and inconsistent with the others in contact with the victim that evening; and, (6) during a five-month period, Duckett, contrary to department policy, had picked up three young women in his patrol car while on duty and engaged in sexual activity with one and made sexual advances toward the other two.
Duckett argues that: (1) while the vehicle which left the tire tracks had driven through a mudhole, no debris was found on his car; (2) although considerable bleeding resulted from the sexual battery, no traces of blood were found in his car; and (3) those who observed him after midnight found him to be neat and clean as though he had just come on duty. We conclude that neither these facts nor Duckett's blanket denial of involvement with the victim or the three young women is sufficient to raise any hypothesis of innocence, given the total circumstances in this case.
In Duckett's second point, he contends that the trial court erred in admitting the testimony of the three young females as Williams rule similar fact evidence. The rule allows evidence to be admitted when it tends to prove or disprove a determinative fact in the cause. See C. Ehrhardt, Florida Evidence § 404.9-.10 (2d ed. 1984). In Drake v. State, 400 So.2d 1217, 1219 (Fla. 1981), we explained:
The mode of operating theory of proving identity is based on both the similarity of and the unusual nature of the factual situations being compared. A mere general similarity will not render the similar facts legally relevant to show identity. There must be identifiable points of similarity which pervade the compared factual situations. Given sufficient similarity, in order for the similar facts to be relevant the points of similarity must have some special character or be so unusual as to point to the defendant.
The evidence in this record established Duckett's tendency to pick up young, petite women and make passes at them while he was in his patrol car at night, on duty, and in his uniform. All of these incidents occurred within six months of the victim's death. We note that Duckett denies involvement in each of these incidents and, in the alternative, argues that the incidents involved no force or violence and involved women who were older than the victim. However, the evidence indicated that the victim appeared to be older than her actual age and that the women in these incidents were petite, like the victim. We find the evidence of the first two incidents to be relevant to establish Duckett's mode of operation, his identity, and a common plan, and we find sufficient points of similarity to conclude that no Williams rule violation occurred as to these two incidents. We also find that evidence of the third sexual encounter should not have been admitted because it was not sufficiently similar to the facts in the instant case, particularly since that encounter was admittedly consensual. However, we conclude that, given all the other evidence, the error in admitting this evidence was harmless under the principles set forth in State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
In his third point, Duckett contends that the trial court erred in qualifying Malone as an expert in hair comparisons. We find no error. We note that, when asked if there were any objections to Malone as an expert, defense counsel replied, "Yes, Your Honor, but none that I will voice for the record." Duckett's counsel extensively challenged Malone's credibility during the cross-examination of Malone and during the testimony of a Florida Department of Law Enforcement expert on hair analysis. It is not our responsibility to reweigh that evidence. The expert's credibility was resolved by the jury.
In his fourth point, Duckett argues that the trial court improperly imposed the death penalty by giving special consideration to the fact that Duckett was a police officer on duty at the time of the offense. Duckett's status at the time of this offense *896 is substantially entwined in the facts of this case. We reject the contention that his status was improperly used as a nonstatutory aggravating circumstance in imposing the sentence. The trial judge properly found two statutory aggravating factors, and we find no error in his determination that the aggravating circumstances outweighed the mitigating evidence.
For the reasons stated, we affirm both the convictions and the sentences in this cause.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, EHRLICH, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[*] Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).