918 So.2d 224 (2005)
James Aren DUCKETT, Appellant,
v.
STATE of Florida, Appellee.
James Aren Duckett, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC01-2149, SC02-1300.
Supreme Court of Florida.
October 6, 2005.
Rehearing Denied December 22, 2005.
*227 M. Elizabeth Wells, Atlanta, GA, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, FL, for Appellee/Respondent.
PER CURIAM.
James Duckett, convicted of first-degree murder and sentenced to death, appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. He also petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we affirm on all issues and deny the petition.

I. FACTS
The facts of this case are presented in detail in our opinion considering Duckett's appeal of his conviction and sentence. See Duckett v. State, 568 So.2d 891, 892-94 (Fla.1990). Essentially they are as follows. The murder occurred in May 1987. At the time, Duckett worked as a police officer for the City of Mascotte. He was the only officer on patrol from 7 p.m. on May 11 to 7 a.m. on May 12. Between 10 and 10:30 p.m. on May 11, Teresa McAbee, an eleven-year-old girl, walked a short distance from her home to a convenience store to purchase a pencil. She left the store with a sixteen-year-old Mexican boy, who was doing laundry next door. They *228 walked over to the convenience store's dumpster and talked for about twenty minutes before Duckett approached them. Duckett entered the store and asked for the girl's name and age. The clerk advised him that Teresa was between ten and thirteen years old. Stating that he was going to check on her, Duckett left the store and walked toward the dumpster, where he located the two children. Duckett testified that he conversed with the children and instructed Teresa to return home.
The sixteen-year-old boy testified that, after speaking with Duckett, he went to the laundromat to wait for his uncle, who arrived soon thereafter; that Duckett and Teresa were standing near the patrol car; and that Duckett asked the uncle the nephew's age. Subsequently, Duckett suggested that the uncle talk to his nephew while he spoke to Teresa. According to the uncle and the boy, Duckett placed Teresa in the passenger's side of his patrol car and shut the door before proceeding to the driver's side. The uncle also testified that he never saw Teresa touch the hood of Duckett's car.
At about 11 p.m., Teresa's mother walked to the convenience store, searching for her daughter. The clerk told her that Duckett may have taken her daughter to the police station. For about an hour the mother and her sister drove around Mascotte in search of Teresa. During this time, the mother did not see a police car. She next went to the Mascotte police station and, finding no one there, drove a short distance to the Groveland police station. There, she told an officer that she wanted to report her daughter as missing. The officer told her that he would contact a Mascotte officer to meet her at the Mascotte police station.
Teresa's mother returned to the Mascotte police station and waited fifteen to twenty minutes before Duckett arrived. Duckett told her that he had spoken with Teresa at the store; that she had been in his police car; and that he had directed her to return home. The mother filed a missing person report with Duckett.
Duckett drove to the mother's home to obtain a picture of Teresa, called the police chief to inform him of the missing person report, and advised the chief that he had made a flyer and did not need any help. Duckett then returned to the convenience store with a flyer but told the clerk not to post it because it was not a good picture. Although he told the clerk that he would return with a better one, he never did. Duckett did bring flyers to two other convenience stores. The clerk at one store testified that, while the police usually drove by every forty-five minutes to an hour, Duckett drove by at 9:30 p.m. but failed to return until he brought the flyer later that evening. A tape of Duckett's radio calls indicated none between 10:50 p.m. and 12:10 a.m. At 1:15 a.m., Duckett went to the uncle's house to question his nephew about Teresa, then around 3 a.m. returned to the mother's home.
Later that morning, Teresa's body was found in a lake less than a mile from the convenience store where Teresa was last seen. A medical examiner testified that the perpetrator had sexually assaulted the victim while she was alive, strangled her, and drowned her, causing her death. Before this incident, the victim had not engaged in any sexual activity. Blood was found on her underpants, but not in or about Duckett's patrol car. Semen was discovered on her jeans.
A technician for the sheriff's department examined the tire tracks at the murder scene and concluded they were very unusual. While leaving the crime scene, he observed that the tracks of a Mascotte police car appeared to be similar. He *229 stopped his vehicle, examined the tracks, and determined that they were consistent with the tracks at the crime scene. An expert at trial corroborated this evaluation. The tracks were made by Goodyear Eagle mud and snow tires, which are designed for northern driving. While the local tire center had not sold any of those particular tires during its nine years of existence, it had received two sets by mistake and placed them on the two Mascotte police cars.
Evidence revealed that the vehicle that left the impressions had driven through a mudhole. However, no evidence was presented that Duckett cleaned his vehicle, and no debris from the scene was found in or on his vehicle. Evidence was also presented that Duckett was neat and clean later that night, as if he had just come on duty.
Both Duckett's and Teresa's fingerprints were discovered on the hood of Duckett's patrol car. Duckett's prints were commingled with the victim's, whose prints indicated that she had been sitting backwards on the hood and had scooted up the car.
A pubic hair was found in the victim's underpants. While other experts could not reach a conclusion by comparing that hair with Duckett's pubic hair, one FBI special agent, who had been qualified in forty-two states as an expert in hairs and fibers, concluded that it was highly probable that it was Duckett's. The expert also testified that the pubic hair did not match the hairs of the sixteen-year-old boy, the uncle, or the others who were in contact with the victim that evening.
Before his arrest, Duckett gave a statement in which he denied driving his vehicle to the lake that evening. He further stated that the victim had not been on the hood of his patrol car and that he had stopped at the Jiffy store for coffee after the girl went home.
The State presented the testimony of three young women who allegedly had sexual encounters with Duckett. The first woman, a petite nineteen-year-old, testified that in January or February 1987 she ran into Duckett while she was looking for her boyfriend. Duckett told her that he, too, was searching for her boyfriend, and drove her in his patrol car. While in the car, Duckett placed his hand on her shoulder and attempted to kiss her. After she refused to kiss him, he desisted and she left the car. The second woman, a petite eighteen-year-old, stated that, on May 1, 1987, Duckett picked her up while she was walking along the highway. After Duckett drove her to a remote area in an orange grove, he parked the car, placed his hand on her breast, and attempted to kiss her. When she refused to kiss him, he desisted and drove her to where she requested. The third woman, a petite seventeen-year-old, testified that on two occasions, once in February or March 1987, and again in April or May 1987, she voluntarily met Duckett at a remote area while he was on patrol and performed oral sex on him.
Duckett testified at trial. He admitted many of the facts surrounding the incident, including his encounter with Teresa, but denied driving off with her and killing her. He also denied any involvement with the three young women.
The jury found Duckett guilty of sexual battery and first-degree murder. In the penalty phase, the State presented no additional testimony, but Duckett presented four witnesses. The jury recommended a sentence of death by an eight-to-four vote. The trial judge found two aggravating circumstances (that the murder was committed during the commission of, or immediately after, a sexual battery; and that the murder was especially heinous, atrocious, or cruel), and one statutory mitigating circumstance *230 (that Duckett had no significant history of prior criminal activity). The trial judge also concluded that Duckett's family background and education gave rise to nonstatutory mitigation. For the murder, the trial judge sentenced Duckett to death, concluding that the aggravating circumstances outweighed the mitigating circumstances; and for the sexual battery conviction, the judge sentenced him to life imprisonment for the mandatory minimum of twenty-five years. On appeal, we affirmed.[1]
Duckett filed his initial 3.850 postconviction motion on May 1, 1992, an amended motion on June 12, 1992, and a consolidated motion on November 14, 1994, raising fourteen claims and various subclaims. Over the next several years the circuit court held a number of evidentiary hearings. On August 10, 2001, the court issued an order denying relief.
At oral argument, counsel for Duckett and the State indicated that DNA testing might be possible on certain items of clothing introduced into evidence. We relinquished jurisdiction to the trial court in order to determine whether there in fact existed clothing that could be tested for DNA. The circuit court determined that none of the evidence examined could produce any relevant information, with one possible exception. A slide identified as Q-6(3), which contained a smear from a vaginal swab taken in 1987, contained an unidentified number of sperm heads that might be useful for further testing. However, because of the small number of sperm heads on the slide as well as the deteriorated condition of the slide, it was determined that testing the slide would not produce any meaningful results and would consume the sample. Duckett informed the circuit court by letter that he did not wish to pursue testing of Q-6(3) based on the unlikelihood of obtaining a DNA profile under current technology and the fact that the sample would be consumed in any attempted test. In its order, the circuit court noted that Duckett had requested that certain itemstwo cigarette butts found at the crime scene, a flip-flop found in the water near the victim, two beer bottles, and one beer canbe tested for DNA. The circuit court ruled that these items were outside the scope of this Court's mandate relinquishing jurisdiction, "and such testing would amount to nothing more than a fishing expedition."[2] The *231 court also denied Duckett's motion for compliance with Brady[3] and Kyles[4] and granted the State's motion to strike because the motion raised issues beyond the scope of this Court's order relinquishing jurisdiction.[5] Duckett also appeals this order.

II. ANALYSIS
Duckett now presents ten claims on appeal: (1) he was denied an adversarial testing because certain exculpatory evidence was not presented;[6] (2) he was denied effective assistance of counsel for failure to investigate, develop, and present mitigation evidence and failure to obtain and present psychological testing; (3) the rule preventing counsel from interviewing jurors violates the federal and Florida constitutions; (4) prosecutorial misconduct rendered Duckett's conviction and sentence fundamentally unfair; (5) his counsel's failure to obtain an adequate mental health evaluation and to provide necessary background information to a mental health consultant denied Duckett a fair trial; (6) the two aggravating factors were constitutionally vague and improperly argued and applied; (7) the jury was misled by argument and instructions which unconstitutionally diluted its sense of responsibility; (8) the penalty phase jury instructions improperly shifted the burden to Duckett to prove that death was inappropriate; (9) Duckett's absence from critical stages of the proceedings violated his rights to due process and a fair trial; and (10) the death penalty constitutes cruel and unusual punishment.
Before addressing some of these claims in detail, we summarily dispose of others as procedurally barred or legally insufficient. Claims 3, 6, 7, 9, and 10 are procedurally barred because they should have been raised on direct appeal.[7] Claims 1(g), 1(h), and 4 are legally insufficient.[8] We also summarily deny claim 8that the penalty phase jury instructions improperly shifted the burden of proof and that death was an inappropriate penaltyas without merit. See, e.g., Freeman v. State, 761 So.2d 1055, 1067 (Fla.2000); Demps v. Dugger, 714 So.2d 365, 368 (Fla.1998). Claim 5 presents an identical argument to that presented in claim 2. We reject this claim as discussed below. Also, because we reject Duckett's individual ineffective assistance of counsel and Brady claims, his cumulative analysis claim under 1(i) also fails.
The remaining issuesclaims 1(a)-(f) and 2warrant further discussion. We *232 discuss these in turn below. We also review issues that have arisen since oral argument, as well as Duckett's petition for a writ of habeas corpus.

A. Recanted Testimony
In claim 1(a), Duckett seeks a new trial because he claims the State's witness, Grace Gwendolyn Gurley, lied at trial about material facts. Gurley testified that on the night of the murder she walked to the Circle K accompanied by two other girls. She saw a Mascotte police officer, whom she later identified as Duckett, and the victim. According to Gurley, Duckett called her and her companions along with the victim and "some Spanish boys" to the police car and told them all to go home because it was past curfew. Instead of going home, Gurley left the store and hid on a path near the store. She then saw Duckett leave "about a minute" later alone. Gurley walked back towards the store to use the phone and saw a police car parked near the dumpster with its headlights off. The victim was still at the store, standing in between the ice machines and the door. Gurley testified that Duckett called the victim and "told her to come here." The victim walked toward the police car. Gurley retreated to the bushes so that the officer would not see her. She heard a door shut. When she looked out, she could not see the victim. The police car backed up and started to drive away. Gurley testified that she saw two people inside the car, "[o]ne was the driver, was the big man, and a small person." Gurley could not describe the small person with any more detail. When she heard about Duckett's arrest, she contacted police with this information.
Gurley testified that she did not receive any type of deal in exchange for her testimony. She also acknowledged that she had been convicted of three felonies. On cross-examination, she admitted that she had lied to the police about not knowing the name of one of the two girls who had accompanied her to the store and about the fact that the girl had gone home earlier in the night.
In various interviews with counsel and investigators after trial, Gurley recanted her testimony, saying that she was not at the Circle K on the night of the murder, that she was told by police what she should say at trial, and that she received special treatment in jail because of her cooperation. In another interview, she recanted portions of her recantation, stating that she was at the store on the night of the murder and did see a police car leave with a passenger. At the evidentiary hearing below, when asked about the night of the murder, Gurley responded, "Your Honor, I feel that I must respectfully invoke my privilege against self-incrimination and decline to answer that question under the Fifth Amendment of the U.S. Constitution, Article I of the Constitution of the State of Florida." When the judge asked her if that would be her response to any questions concerning the night of the murder, Gurley responded in the affirmative.
We previously have explained the factors relevant to deciding whether to grant a new trial based on recantation. In Armstrong v. State, 642 So.2d 730, 735 (Fla. 1994), we said:
Recantation by a witness called on behalf of the prosecution does not necessarily entitle a defendant to a new trial. Brown v. State, 381 So.2d 690 (Fla.1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981); Bell v. State, 90 So.2d 704 (Fla.1956). In determining whether a new trial is warranted due to recantation of a witness's testimony, a trial judge is to examine all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. Bell. *233 "Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury." Id. at 705 (quoting Henderson v. State, 135 Fla. 548, 561, 185 So. 625, 630 (1938) (Brown, J., concurring specially)). Only when it appears that, on a new trial, the witness's testimony will change to such an extent as to render probable a different verdict will a new trial be granted. Id.

The circumstances of Gurley's alleged recantation do not satisfy this standard. Based on her statements at the evidentiary hearing, it appears that she would not testify to anything new at a new trial. In fact, she would not testify at all. Therefore, the purported change in her testimony would be unlikely to result in a different verdict. Although the case against Duckett was circumstantial, strong evidence besides Gurley's testimony linked him to the murder. On direct appeal, we concluded "that the following facts satisfy the test in Davis:"[9]
(1) the victim was last seen in Duckett's patrol car; (2) the tire tracks at the murder scene were consistent with those from Duckett's car; (3) no one saw Duckett, the only policeman on duty in Mascotte, from the time he was last seen with the victim until the time he met the victim's mother at the police station; (4) numerous prints of the victim were found on the hood of Duckett's patrol car, although he denied seeing her on the hood; (5) a pubic hair found in the victim's underpants was consistent with Duckett's pubic hair and inconsistent with the others in contact with the victim that evening; and, (6) during a five-month period, Duckett, contrary to department policy, had picked up three young women in his patrol car while on duty and engaged in sexual activity with one and made sexual advances toward the other two.
Duckett, 568 So.2d at 894-95. Only one of these numbered facts concerns Gurley's testimony. Our confidence in the verdict is not undermined if Gurley's testimony is removed from this list. Sufficient additional circumstantial evidence exists in this case so that a new trial would not produce a different verdict.[10]
Duckett also asserts a related claim of ineffective assistance of counsel based on counsel's failure to present Gurley's previous admission to lying in a sexual harassment complaint against a Mascotte police officer and counsel's failure to impeach Gurley through her inconsistent pretrial statements.[11] The following standards apply to claims of ineffective assistance of counsel:
An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."
*234 Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting Strickland v. Washington, 466 U.S. 668, 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (citation omitted). Therefore, to succeed on his various claims of ineffective assistance of counsel, Duckett must establish deficient performance and resulting prejudice. Duckett fails to demonstrate either.
Duckett fails to demonstrate that his counsel performed deficiently. As to his cross-examination of Gurley, the jury heard of Gurley's prior felony convictions, and defense counsel impeached her with inconsistencies between her deposition and trial testimony. As to Gurley's false sexual harassment allegation, it was made to the Lake County Sheriff's Department, a wholly separate entity from the Mascotte Police Department. Duckett fails to establish how counsel reasonably could have discovered this information from a different case at a different police department.
Duckett also fails to establish prejudice. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. As explained above, even without Gurley's testimony, there was strong circumstantial evidence presented at trial.

B. Physical Evidence
Claims 1(b)-(e) concern various pieces of physical evidence such as hair, tire tracks, fingerprints, and a pencil found at the crime scene. We address each in turn.
With respect to the hair evidence, Duckett claims that the State improperly engaged in expert shopping. This claim is procedurally barred because it should have been raised on direct appeal. See, e.g., Sireci v. State, 773 So.2d 34, 40 n. 10 (Fla.2000); Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995). Duckett also claims that the State's witness, FBI expert Michael Malone, was not credible. The circuit court concluded that "[t]he attack upon Agent Malone of the FBI is unfounded and without merit." This conclusion is supported by the record. At the evidentiary hearing it was established that Malone had received proficiency tests in the examination of hair and fiber and had never failed. Furthermore, Malone had previously testified as an expert in the field of hair and fiber, and no court has refused to recognize him as an expert. On direct appeal, we discussed Malone's credibility: "Duckett's counsel extensively challenged Malone's credibility during the cross-examination of Malone and during the testimony of a Florida Department of Law Enforcement expert on hair analysis. It is not our responsibility to reweigh that evidence. The expert's credibility was resolved by the jury." Duckett, 568 So.2d at 895.[12]
Duckett also makes several Brady claims concerning the hair evidence. Three requirements must be met in order to establish a Brady claim:
The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.
*235 Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see Wright v. State, 857 So.2d 861, 869 (Fla. 2003) (quoting Strickler). Furthermore, "[t]he burden is on the defendant to demonstrate that the evidence he claims as Brady material satisfies each of these elements. Even where favorable evidence is suppressed, a new trial will not be necessary where it is determined that the favorable evidence did not result in prejudice." Id. at 870. None of Duckett's Brady claims satisfy these requirements. His conclusory claim that a second unknown hair was found on the victim but never presented to the jury is denied as insufficiently pled because it fails to identify the alleged hair as Brady material and fails to argue the effect the evidence would have had at trial. Duckett also asserts that the State failed to disclose information that could have been used to impeach agent Malone. Specifically, Duckett claims that the State should have disclosed information contained in a 1997 Department of Justice report indicating that Malone testified falsely in a court proceeding in 1985. However, this 1997 report did not exist when Duckett was tried in 1988 or when we affirmed his conviction and sentence in 1990. Duckett fails to establish that the State "either willfully or inadvertently" suppressed the information. Strickler, 527 U.S. at 282, 119 S.Ct. 1936.
Regarding the tire tracks, Duckett alleges that counsel was ineffective for failing to investigate the origin of the tires and the tire tracks at the crime scene, failing to present a forensic expert, and failing to impeach the State's witness about the tires. Duckett's conclusory arguments on this issue are legally insufficient and fail to present a proper basis for relief.
Regarding the fingerprints, Duckett presents a conclusory claim that trial counsel was ineffective for failing to present an expert to rebut the State's fingerprint evidence at trial. This claim is legally insufficient. Furthermore, at the evidentiary hearing it was established that defense counsel obtained a fingerprint expert in preparation for trial and did not present an additional expert at trial because, in trial counsel's words, "the report I got [from the expert] was not significantly helpful, as a matter of fact, not helpful at all to the Defense." Trial counsel considered the possibility of presenting a rebuttal expert but made a strategic decision not to call the expert. See, e.g., Rutherford v. State, 727 So.2d 216, 223 (Fla.1998) ("Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected.").
Finally, regarding a pencil found at the crime scene, Duckett claims that trial counsel should have presented the circumstances surrounding its discovery, as well as expert testimony disputing the fact that the pencil had remained outside for ten days.[13] This claim is legally insufficient because it fails to address the prejudice prong of Strickland. Duckett's vague assertion that he was "denied an adversarial testing" is insufficient to present a valid claim for relief.

C. Consolidation
In claim 1(f), Duckett argues that trial counsel was ineffective for stipulating to consolidating the charges of sexual battery and first-degree murder because *236 it paved the way for admission of the Williams rule[14] testimony. We conclude that trial counsel was not ineffective for stipulating to consolidation. Charges arising out of the same occurrence such as those brought against Duckett are routinely consolidated. See Fla. R.Crim. P. 3.150(a) ("Two or more offenses that are triable in the same court may be charged in the same indictment or information in a separate count for each offense, where the offenses ... are based on the same act or transaction or on 2 or more connected acts or transactions."); Mendyk v. State, 545 So.2d 846, 849 (Fla.1989) (approving consolidation of first-degree murder, kidnapping, and sexual battery charges because the crimes were committed in a continuous episode on a single victim); Clark v. State, 379 So.2d 97, 103 (Fla.1979) (approving consolidation of charges of murder, extortion, and kidnapping); Wright v. State, 739 So.2d 1230, 1233 (Fla. 1st DCA 1999) (approving consolidation of charges of sexual battery and engaging in sexual activity with a person sixteen or seventeen years old where the "related offenses arose from and were based on the same act or transaction, which occurred in one location within a short period of time"). The sexual battery and murder of the victim in this case were committed by the same person on a single victim in a single episode. An objection would have been futile.

D. Additional Penalty Phase Witnesses
In claim 2, Duckett argues that trial counsel was ineffective for failing to call additional witnesses to testify at the penalty phase about Duckett's good character, close family upbringing, loving relationship with his (now ex) wife and two sons, his decision to enter the police force, and general all-around "normal" life before the murder. Duckett fails to show either deficient performance or prejudice. At the penalty phase, trial counsel presented four witnesses: Duckett's brother, a family friend, his wife, and himself. These witnesses testified that Duckett lived an ordinary family life with his wife and two sons, was a good person and hard worker, and did not exhibit any strange sexual behavior outside his marriage or toward young girls. At the postconviction evidentiary hearing Duckett presented several additional witnesses, including several members of his extended family, as well as family friends and professional acquaintances. The testimony of these witnesses was generally cumulative to that presented at the penalty phase. See Teffeteller v. Dugger, 734 So.2d 1009, 1021 (Fla.1999) ("Much of the mitigating evidence that [defendant] faults counsel for not presenting is cumulative to that presented by the mental health expert and [defendant] during the resentencing proceeding."); Routly v. State, 590 So.2d 397, 401 (Fla.1991) (finding that defendant did not demonstrate reasonable probability that sentence would have been different where much of the proffered mitigating evidence was already before the judge and jury in a different form). Trial counsel's performance was not deficient simply because he did not present cumulative evidence. See Cole v. State, 841 So.2d 409 (Fla.2003) (rejecting ineffective assistance of counsel claim where counsel did not present cumulative evidence of defendant's drug problem); Valle v. State, 705 So.2d 1331, 1334-35 (Fla.1997) (rejecting ineffective assistance *237 claim based on trial counsel's failure to present cumulative evidence).[15]

E. Failure to Obtain Psychological Testing
In claim 2, Duckett also alleges that trial counsel was ineffective for failing to obtain and present psychological testing at the penalty phase. Again, Duckett fails to establish either deficient performance or prejudice. The United States Supreme Court has stated that "[a] defendant's mental condition is not necessarily at issue in every criminal proceeding." Ake v. Oklahoma, 470 U.S. 68, 82, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). As he testified at the evidentiary hearing, trial counsel had no reason to suspect that any mental mitigating evidence could be developed. See Mills v. State, 603 So.2d 482, 485 (Fla. 1992) (finding trial counsel's actions did not constitute deficient performance where trial counsel had no reason to suspect that any mental health mitigating evidence could be developed). This is not a case where the defendant had a severe mental disorder that should have been presented to the jury. See, e.g., Rose v. State, 675 So.2d 567, 573 (Fla.1996) ("[S]evere mental disturbance is a mitigating factor of the most weighty order, and the failure to present it in the penalty phase may constitute prejudicial ineffectiveness.").
Even the expert Duckett presented in support of his postconviction motion did not find any mental problems. Dr. Patricia Fleming, a clinical psychologist, testified that she evaluated and tested Duckett, reviewed information about his life, and interviewed some of his family members. She summarized Duckett's test results as follows:
The test results show that this is an intellectually sound man who is able to organize information, to think rationally and act purposefully and deal effectively with the environment. He has the intellectual strengths and capacities to do that. He comes across as a man who is a caring man, wants to please people, is notdoesn't have according to the test results an underlying anger, hostility, aggressive, sadistic side to him. He comes across as, actually typical of people who are functioning on the outside, that are outside of prison. He did not give evidence of malingering.
Duckett's claim is essentially that a mental health expert should have been presented to reinforce the idea that he does not have mental health problems or sadistic tendencies. Such an expert would merely have provided cumulative evidence to that already presented at the penalty phase through the testimony of Duckett and his friends and family. Duckett fails to establish deficient performance or prejudice on this claim.

F. Post Oral Argument Issues
As noted above, this Court temporarily relinquished jurisdiction in this case for the limited purpose of determining if DNA testing could be performed on certain items of clothing. While those proceedings were pending, Duckett also filed a motion in the circuit court for compliance with Brady and Kyles. Duckett appeals the circuit court's denial of his request for testing of certain items, including two cigarette butts, a flip-flop, two beer bottles, and one beer can, because it would be *238 beyond the scope of this Court's relinquishment order. Duckett also appeals the circuit court's denial of his motion for compliance with Brady and Kyles.
Duckett claims that this Court's relinquishment order should be considered the equivalent of a granted motion for DNA testing under Florida Rule of Criminal Procedure 3.853. Duckett has never filed any motion under rule 3.853, however, regarding the current items sought to be tested. Rule 3.853 provides formal requirements for a defendant seeking post-conviction DNA testing of evidence. Among other pleading requirements, a defendant must include a statement that the evidence sought to be tested has not previously been tested or that new testing technology exists that may obtain better results than the original test. See Fla. R.Crim. P. 3.853(b). Rule 3.853 also requires several specific factual allegations as well as a statement about how the new DNA evidence will help exonerate the defendant or mitigate the sentence. See id. Respecting rule 3.853, this Court has stated:
Rule 3.853 is not intended to be a fishing expedition. Rather, it is intended to provide a defendant with an opportunity for DNA testing of material not previously tested or of previously tested material when the results of previous DNA testing were inconclusive and subsequent developments in DNA testing techniques would likely provide a definitive result, and when a motion for such testing provides a basis upon which a trial court can make the findings expressly set forth in subdivision (c)(5) of rule 3.853.
Hitchcock v. State, 866 So.2d 23, 27-28 (Fla.2004). Duckett did not file a motion under rule 3.853. Therefore, the standards that apply to that rule do not apply to the relinquishment order.
In this case, we relinquished jurisdiction on our own motion based on an exchange with counsel during oral argument. Counsel for both sides stated that clothing may exist that might be successfully tested for DNA. The order specifically refers to "clothing" three times:
At oral argument ... both Duckett and the State stipulated that DNA testing may be possible on clothing introduced into evidence. ... [W]e remand this case to the trial court to determine whether clothing exists that can be tested for DNA.... If the trial court determines that DNA testing is possible on any clothing, any such testing shall be completed, and the parties shall report the results to this Court, within 180 days of the date of this Order.
The circuit court properly interpreted this order as limiting the scope of DNA testing. We recognize that certain non-clothing items were tested, including a vaginal swab and fingernail scrapings from the victim. However, the record indicates that the testing of at least some of the non-clothing items was done at the request of the Florida Department of Law Enforcement (FDLE) through the State.[16] FDLE made no such request on the other items Duckett sought to have tested. In reaching its decision that those items were outside the scope of the relinquishment order, the court stated that testing of the additional items "would amount to nothing *239 more than a fishing expedition." We agree. The relinquishment order was narrowly drafted and intended to be applied narrowly.
Duckett also contends that the circuit court erred by ruling that the motion for compliance with Brady and Kyles addressed issues beyond the scope of our relinquishment of jurisdiction. As discussed above, the relinquishment order gave narrow instructions for the circuit court to determine if clothing existed that could be tested for DNA. Duckett had by this time already received a full evidentiary hearing on his postconviction motion before the circuit court and oral argument before this Court. By relinquishing jurisdiction, we did not intend to give Duckett the opportunity to assert new claims.
Nevertheless, Duckett claims that the State is under a continuing duty throughout all proceedings to comply with Brady. See Strickler, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286; High v. Head, 209 F.3d 1257, 1264 n. 8 (11th Cir.2000) ("The State's duty to disclose exculpatory material is ongoing."). This duty extends to postconviction proceedings. See Thompson v. Calderon, 151 F.3d 918, 935 n. 12 (9th Cir.1998) ("The Brady duty is an ongoing one, and continued to bind the prosecution throughout [defendant's] habeas proceedings."). While this is a correct statement of the law, Duckett fails to explain how he can bring the current claim. He had the opportunity to make these arguments in his postconviction motion, which he amended twicethe second time over two years after the original motion was filed. To assert a new Brady claim at this point, Duckett must file a successive motion under Florida Rule of Criminal Procedure 3.851(e)(2) and comply with its requirements. We relinquished jurisdiction for a limited purpose, and the circuit court properly ruled that the motion for compliance with Brady and Kyles goes beyond the scope of our order.

G. Petition for Habeas Corpus
Duckett also petitions this Court for a writ of habeas corpus, presenting four claims: (1) he is innocent and his execution would be a miscarriage of justice; (2) his direct appeal does not meet constitutional requirements because the State failed to disclose pertinent facts necessary to the Court's review; (3) appellate counsel failed to raise numerous meritorious issues on direct appeal; and (4) Duckett's death sentence violates the United States Supreme Court's decisions in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
We deny all claims. Duckett's claim that he is innocent and his execution would be a miscarriage of justice is legally insufficient as it fails to present a valid basis for habeas relief. His Brady claim that his direct appeal does not meet constitutional requirements because the State failed to disclose pertinent facts necessary to this Court's review concerns the State's hair analysis expert and is also raised in his 3.850 motion. This claim is denied as discussed above. His claim that appellate counsel failed to raise numerous meritorious issues on direct appeal that warrant reversal of the convictions and sentence of death is insufficiently pled and therefore denied. Finally, Duckett's habeas claim that his sentence violates the principles recognized in Apprendi and Ring is without merit. See Johnson v. State, 904 So.2d 400, 412 (Fla.2005) (holding that Ring does not apply retroactively).

III. CONCLUSION
We affirm the circuit court's order denying Duckett's 3.850 motion for postconviction *240 relief and deny his petition for habeas corpus. We also affirm the circuit court's orders upon relinquishment denying the testing of additional items and finding that the motion for compliance with Brady and Kyles asserted issues beyond the scope of our order.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Duckett raised four issues: (1) that the circumstantial evidence against him did not exclude all reasonable hypotheses of innocence; (2) that the trial court erred in admitting the testimony of the three female witnesses; (3) that the trial court should not have qualified the FBI expert in the field of hair analysis; and (4) that the trial court erred in imposing the death penalty. See Duckett, 568 So.2d at 894. We denied claims 1, 3, and 4. As to claim 2, we found the evidence of the first two incidents relevant to establish Duckett's mode of operation, his identity, and a common plan, and found sufficient points of similarity to conclude that no Williams rule violation occurred. See Williams v. State, 110 So.2d 654 (Fla.1959). As to the third encounter, we found that it should have been excluded because it was not sufficiently similar to the facts in Duckett's case, particularly because that encounter was consensual. Nevertheless, we concluded that, given all the other evidence, the error was harmless. Duckett, 568 So.2d at 895.
[2] This Court's order reads as follows:

At oral argument before this Court on March 6, 2003, both Duckett and the State stipulated that DNA testing may be possible on clothing introduced into evidence in this case. Therefore, we remand this case to the trial court to determine whether clothing exists that can be tested for DNA. The trial court shall hold the hearing within 30 days of the date of this Order. If the trial court determines that DNA testing is possible on any clothing, any such testing shall be completed, and the parties shall report the results to this Court, within 180 days of the date of this Order.
[3] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[4] Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
[5] This separate order dated October 20, 2003, did, however, order the State to procure an affidavit from Lifecodes (now Orchid), a company that might have further DNA evidence in this case. Lifecodes/Orchid subsequently submitted an affidavit that they possessed no further evidence relating to Duckett's case.
[6] Claim 1 contains several subparts that address (a) State witness Gwen Gurley; (b) hair evidence; (c) tire tracks; (d) fingerprints; (e) a pencil; (f) Williams rule evidence; (g) other unheard evidence; (h) unheard corroborating evidence; and (i) cumulative analysis. These claims are addressed individually below.
[7] Insofar as claim 3 is based on newly discovered evidence, Duckett is not entitled to juror interviews because his allegation involves the verdict itself and relates to the jury's deliberations. See Johnson v. State, 593 So.2d 206, 210 (Fla.1992) ("[A] verdict cannot be subsequently impeached by conduct which inheres in the verdict and relates to the jury's deliberations."). To the extent claim 9 states a claim of ineffective assistance of counsel, it is without merit.
[8] Claim 4 is also procedurally barred.
[9] Davis v. State, 90 So.2d 629, 631 (Fla.1956), sets forth the standard to be applied in cases based on circumstantial evidence.
[10] Our recitation of the facts did not rely on, or even mention, Gurley's statement that she saw Duckett leave the store with a small person in his car.
[11] Duckett also broadly claims that the State failed to disclose information, but fails to identify the specific information the State failed to disclose. Therefore, that portion of his argument is unpreserved as insufficiently argued.
[12] Duckett also claims that a conviction cannot stand when based solely on hair comparison testimony. This claim is procedurally barred because it could have been raised on direct appeal.
[13] Duckett alleges that after ten days of exposure the pencil should have been in a more deteriorated state.
[14] The Williams rule, codified as section 90.404, Florida Statutes (2002), "provides that similar fact evidence of other crimes is admissible when relevant to prove a material fact in issue, but is inadmissible when the evidence is relevant solely to prove bad character or propensity." Cartwright v. State, 885 So.2d 1010, 1013 (Fla. 4th DCA 2004).
[15] Duckett partly relies on trial counsel's admission that it was probably a mistake not to call additional witnesses. However, this Court has stated that "an attorney's own admission that he or she was ineffective is of little persuasion in these proceedings." Kelley v. State, 569 So.2d 754, 761 (Fla.1990) (citing Johnson v. Wainwright, 463 So.2d 207 (Fla.1985) (quoting trial court's order)).
[16] The State's motion to release additional evidence states that an FDLE technician "determined the following items would assist them in complying with the Supreme Court's Order." The motion then lists the exhibits FDLE sought to test. Curiously, Duckett argued in his motion to the circuit court opposing the State's motion to release additional evidence that this Court's order should be read narrowly to include only clothingthe very opposite of his current argument.