KELLUM, Judge.[1]
The appellant, Larry Dunaway, currently an inmate on Alabama’s death row in Holman Correctional Facility, appeals the circuit court’s denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P.
In October 1997, Dunaway was convicted of capital murder for murdering Tressa Patterson during the course of an arson and for murdering James Anthony Patterson, a 22-month-old child, during the course of an arson. See § 13A-5-40(a)(9), Ala.Code 1975. The jury recommended that Dunaway be sentenced to life imprisonment without the possibility of parole for Tressa’s murder and to death for James’s murder. The circuit court followed the jury’s recommendations. Duna-way’s convictions and sentences were affirmed on direct appeal. See Dunaway v. State, 746 So.2d 1021 (Ala.Crim.App.1998), aff'd, 746 So.2d 1042 (Ala.1999), cert. denied, 529 U.S. 1089, 120 S.Ct. 1724, 146 L.Ed.2d 645 (2000). This Court issued the certificate of judgment on November 10, 1999.
In April 2001, Dunaway filed a Rule 32 petition in the Barbour Circuit Court attacking his convictions and sentences. He filed amended petitions in October 200Í and January 2004. Evidentiary hearings were held in January 2004, June 2004, and August 2004. On December 14, 2006, the Rule 32 court adopted the State’s 110- *537 page order denying the Rule 32 petition. This appeal followed.
This Court set out the following facts in our opinion on direct appeal:
“The evidence showed that [Dunaway] lived with his girlfriend, Tressa Patterson, and her son, James Patterson, in a mobile home in Barbour County. On the evening of January 8, 1997, the mobile home burned. Investigators subsequently discovered the burned bodies of Tressa Patterson and James Patterson, who was 22 months old, in the remains of the' mobile home.
“In the course of his investigation, [Fire Marshall Edward] Paulk interviewed [Dunaway]. [Dunaway] made an oral statement and gave a written statement about the fire. In his oral statement, [Dunaway] claimed that he was not present when the fire began. He stated that he had ridden with a ‘crackhead’ in a red pickup truck into Clayton, where he hoped to sell some crack cocaine. He claimed that he decided not to sell the crack, that the man dropped him off on Highway 239 near his mobile home, and that he walked home from thére. [Dunaway] claimed that he first sáw the fire while he was walking home. He stated that the last time he saw Tressa, she was lying on the couch and James was with her.
“Subsequently, [Dunaway] admitted to Paulk that the story about the man in the red truck was not true. Paulk then asked [Dunaway] if he could take a written statement from him, and [Dunaway] agreed. In that statement, [Dunaway] admitted that he and Tressa had been having problems in their relationship since Thanksgiving of 1996. He stated that Tressa had told him to move out by December 26, 1996, that he had not moved out, and that they had been arguing since December 26, 1996. On or about January 5, 1997, when [Dunaway] still had not moved out, Tressa removed his clothing from the mobile home.
“On January 8, 1997, [Dunaway] watched over James while Tressa was at work. He stated that he and Tressa got into another argument when she came home from work, and that he put a rifle to his head to show his ‘love’ for her. He claimed that he pulled the trigger, but it did not fire. He then laid the rifle on his lap and accidentally fired it at Tressa. [Dunaway] stated that Tressa gasped when she' was struck by the first bullet. The noise caused him to panic and he accidentally fired the rifle a second time. [Dunaway] told Paulk that after he determined that Tressa was dead, he said to James, ‘Man, yo momma’s dead.’ He then poured rubbing alcohol over Tressa’s body and beside the fireplace in the living room. He laid James down near his mother’s body and set the alcohol on fire. He then fled to a nearby wooded area and hid the rifle.
“[Dunaway] testified at trial in his own defense. He testified that his mother suffered from paranoid schizophrenia, and that he had heard voices telling him what to do since he was a child. His trial testimony about the murders was similar to his statement to Paulk, except that .he -testified that voices started talking to him while he was in the mobile home. He stated -that he did not remember everything he did between the time he shot Tressa and the time he realized he was in the woods, and he added that he was not in control of himself at the time. He contended that he did what the voices told him to do. He testified that he made up the story about going to Clayton because' he was scared and nervous. He also admit *538 ted that, in spite of his statements immediately following the fire,, he knew Tressa and James were in the mobile home when it was burning.”
Dunaway, 746 So.2d at 1023-25.

Standard of Review

This postconviction proceeding was initiated by Dunaway. According to Rule 32.2, Ala. R.Crim. P., Dunaway has the sole “burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle [him] to relief.” ' When discussing the burden of pleading, this Court in Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003), stated:
“ ‘Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.’ Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not the pleading of a conclusion ‘which, if true, entitle[s] the petitioner to relief.’ Lancaster v. State, 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the' allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R.Crim. P., to present evidence proving those alleged facts.”
913 So.2d at 1125.
“The standard of review on appeal in a post conviction proceeding is whether the trial judge abused his discretion when he denied the petition. Ex parte Heaton, 542 So.2d 931 (Ala.1989).” Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992). “[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). “Moreover, “when reviewing a circuit court’s rulings made in a postconviction petition, we may affirm a ruling if it is correct for any reason.’ ” Lee v. State, 44 So.3d 1145, 1149 (Ala.Crim.App.2009), quoting Bush v. State, 92 So.3d 121, 134 (Ala.Crim.App.2009).
Last, on direct appeal we reviewed Dun-away’s conviction for plain error. However, the plain-error standard of review does not apply to postconviction petitions filed pursuant to Rule 32, Ala. R.Crim. P., even when those petitions attack capital-murder convictions in which the death sentence has been imposed. See Hunt v. State, 940 So.2d 1041, 1049 (Ala.Crim.App.2005).
I.
Dunaway first argues that the circuit court erred in adopting in toto the State’s proposed order denying postconviction relief because, he argues, the findings of fact are not those of the circuit court’s.
“Alabama Courts have repeatedly upheld the circuit court’s adoption of proposed orders drafted by the State in post-conviction cases.” Hodges v. State, 147 So.3d 916 (Ala.Crim.App.2007). “[E]ven when a circuit court adopts a proposed order in its entirety, the petitioner must show that the findings of fact and conclusions of law m that order are ‘clearly erroneous’ before an appellate court will reverse the order solely on the basis that the order was submitted by the State.” Hyde v. State, 950 So.2d 344, 371 (Ala.Crim.App.2006). For the reasons set out in this opinion, we find that the circuit court’s findings are not clearly erroneous. Therefore, no basis for relief exists regarding this claim.
II.
Dunaway next argues that the circuit court erred in denying his claim that several jurors failed to truthfully answers questions during voir dire examina *539 tion, thereby, he argues, denying him the ability to use his peremptory strikes effectively and to make any challenges for cause,
“It is true that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely. See Fabianke v. Weaver, 527 So.2d 1258 (Ala.1988). However, not every failure to respond properly to questions propounded during voir dire ‘automatically entitles [the defendant] to a new trial or reversal of the cause on appeal.’ Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330, 335 (1970); see also Dawson v. State, [710 So.2d 472] at 474 [(Ala.1997)]; and Reed v. State, [547 So.2d 596 (Ala.1989) ]. As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is “whether the defendant might have been prejudiced by a veniremember’s failure to make a proper response.’ Ex parte Stewart, 659 So.2d [122] at 124 [ (Ala.1993) ]. Further; the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court’s discretion.”
Ex parte Dobyne, 805 So.2d 763, 771-72 (Ala.2001) (footnote omitted).
“The Supreme Court in Ex parte Do-bynel, 805 So.2d 763 (Ala.2001),] identified factors to be used to determine whether probable prejudice existed. The factors include the' temporal remoteness of the event, the ambiguity of the question asked, and the juror’s willfulness in providing inaccurate information. 805 So.2d at 772.
“ ‘The form of prejudice that would entitle a party to relief , for a juror’s nondisclosure or falsification in voir dire would be its effect; if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror. Ex parte Ledbetter, 404 So.2d 731 (Ala.1981); Warrick v. State, 460 So.2d 320 (Ala.Crim.App.1984); and Leach v. State, 31 Ala.App. 390, 18 So.2d 285 (1944). If the party establishes that the juror’s disclosure of the truth- would have caused the party either to (successfully) challenge the juror for cause or to exercise a peremptory challenge to strike the juror, then the party has made a prima facie showing of prejudice. Id.”’ •
McGahee v. State, 885 So.2d 191, 203-04 (Ala.Crim.App.2003), quoting in part Ex parte Dobyne, 805 So.2d at 772-73. With these principles in mind we review Duna-way’s claims.
A.
First, Dunaway contends that juror L.L.[2] failed to disclose during voir dire examination that a family member had been the victim of a crime. At the Rule 32 evidentiary hearing, L.L. testified that she had a family member who had been the victim of a shooting in the family member’s home; she did not identify the family member’s relationship to her. Dunaway pleaded in his consolidated petition that L.L.’s “cousin”-had been the victim of a violent crime. (C.R. 491.)
The circuit court stated the following in regard to this claim:
“Dunaway contends juror [L.L.] .did not disclose during voir dire that a member of her family was a victim of. a shooting.. According to Dunaway, if [L.L.] had divulged this information, his trial counsel would have removed her by *540 a for-cause challenge or by exercising a peremptory strike.
“Dunaway’s collateral counsel did not ask [trial counsel] if they would have removed [L.L.] if she had indicated she was related to a shooting victim. Further, [L.L.] indicated at the hearing that if she did not inform defense counsel and the prosecutor one of her relatives was the victim of a shooting it was because she was not asked or did not understand the question. In any event, [L.L.] affirmatively indicated that the fact her relative had been the victim of a shooting did not affect her deliberations in Dunaway’s case and that she based her verdicts and sentencing recommendations on the evidence at trial and the trial court’s jury instructions.
“The Court finds this allegation of juror misconduct is without merit. Rule 32.7(d), Ala. R.Crim. P. In the alternative, the Court finds Dunaway failed to meet his burden of proving by a preponderance of evidence that this allegation of juror misconduct might have caused him to be prejudiced as required by Rule 32.3, Ala. R.Crim. P.”
(C.R. 663-64.)
We have examined the record of Duna-way’s trial.[3] The record indicates that during voir dire examination the entire venire was asked if they had a family member or a friend who had been the victim of a crime. L.L. did not respond to this question. Dunaway asserts that the jurors were asked three times if they had a family member who had been the victim of a crime. However, the venire was questioned in three panels and each panel was asked the same question. Postconviction counsel asked L.L. very few questions— her direct examination consists of approximately two pages of transcript. L.L. was mi asked what her relationship was to the family member. Also, on cross-examination L.L. responded that she did not hear a question related to her family and that the fact that a family member had been the victim of a shooting had no impact on her verdict in Dunaway’s case. Also, Dun-away’s counsel were not asked whether they would have struck L.L. for cause had she answered the questions. We agree with the circuit court that Dunaway was due no relief in regard to juror L.L. because he failed to meet his burden of proof.
B.
Second, Dunaway argues that several jurors failed to disclose their connection to the district attorney — Boyd Whigham. Specifically, he asserts that juror E.B. failed to disclose that the district attorney had previously represented her in a custody dispute related to her granddaughter and that juror M.B. failed to disclose that she had worked for the district attorney as a maid in his home and that he had previously represented her in a divorce action.
The circuit court stated the following in its order denying relief regarding juror E.B.:
“Dunaway contends juror [E.B.] did not disclose in her juror questionnaire that she knew Boyd Whigham, the Barbour County District Attorney, before trial. According to Dunaway, Mr. Whigham ‘provided legal assistance in a child custody suit regarding her granddaughter during the 1980s.’
“According to Dunaway, if [E.B.] had divulged this information, his trial counsel would have removed her by a for-cause challenge or by exercising a peremptory strike.
*541 “Dunaway’s collateral counsel did not ask [trial counsel] if they would have removed [E.B.] if she had disclosed this information. Further, at the evidentiary hearing, [E.B.] indicated Whigham’s pri- or representation had no bearing at all on her. ability to -sit on Dunaway’s case. According to [E.B.], she based, her verdicts and sentencing recommendations on the evidence presented at Dunaway’s trial.
“The Court finds this allegation of juror misconduct is without merit. Rule 32.7(d), Ala. R.Crim. P. In the alternative, the Court finds Dunaway failed to meet his burden of proving by a preponderance of evidence that this allegation of juror misconduct might have caused him to be prejudiced as required by Rule 32.3, Ala. R.Crim. P.” .
(C.R. 662-63.)
-The record indicates that the-jury was asked if the district attorney had previously represented any one of them while he was in private practice. Juror E.B. did not respond. During the postconviction hearing E.B. said that in the early 1980s her “son’-’ had retained Whigham to represent him in a custody dispute involving her granddaughter. She said that Whigham’s representation of her son had no bearing on her verdict in- Dunaway’s case. (R. 260.)
In regard to juror M.B., the circuit court stated:
“Dunaway alleged that alternate juror [M.B.] did not disclose during voir dire that [the district attorney] had done legal work for her when he was in private practice, that she had worked' at his house as a maid, and that she had heard about the facts of the case. According to Dunaway, if [M.B.] had divulged this information, his trial counsel would have removed her by a for-cause challenge or by exercising a peremptory strike.
“Dunaway’s collateral counsel did not ask [trial counsel] if they would have removed [M.B.] if she had disclosed this information. Moreover, the trial record indicates that [M.B.] served as an alternate juror and was excused before the jury’s guilt phase deliberations began. Dunaway presented no evidence [M.B.] discussed her past associations with Mr. Whigham with members of his jury. If, for some reason, [M.B.] failed to answer questions during voir dire it would not have caused Dunaway to be prejudiced. See Reeves v. State, 807 So.2d 18, 32 (Ala.Crim.App.2000) (holding ‘[t]here [was] simply no possibility[5] Reeves was harmed by jurors’ failure to recall their remote connections with Reeves and the 'victim because both were excused before jury deliberations began and.there was no evidence .they informed other jurors about their connections with the case).
“The Court finds that this, allegation of juror misconduct is without merit. Rule 32.7(d), Ala. R.Crim. P. In the alternative, the Court finds Dunaway failed to meet his burden of proving by a preponderance of evidence that this allegation of juror misconduct might have caused him to be prejudiced as required by Rule 32-3, Ala. R.Crim. P.”
(C.R. 664-66.)
Dunaway asserts that M.B. responded on her questionnaire that she did not know anyone in the district attorney’s office. However, the trial record shows that at the beginning of the voir dire examination M.B. responded to a question whether she had any problem that would make it difficult for her to serve on the jury. M.B. told the circuit court that she could not read very well.
At the Rule 32 evidentiary- hearing M.B. testified that she had worked for Whigham as a maid in his home, that she *542 had had little contact with him because she dealt with his wife, and that in 1984 he had represented her in a divorce action. Dun-away was tried in 1997. M.B. did not testify when .she had worked for Whigham. Also, M.B. was- an alternate and was excused before the jury started its deliberations'.. Nor was M.B. questioned about whether she discussed her relationship with any of the other jurors.
There is no indication that the circuit court abused its considerable discretion in denying Dunaway'relief on his claims related to jurors E.B. and M.B.
C.
Dunaway next argues that juror W.H. - committed juror misconduct by visiting the scene of the crime. Specifically, he argues that he is entitled to a new trial because W.H. visited 'the burned trailer in which the victims’ bodies were found.
The circuit court stated the following when denying relief on this claim:
“The last juror witness called by Dun-away’s collateral counsel was [W.H.]. [W.H.’s] testimony was continued until August 17, 2004, due to his health. Dunaway alleged that [W.H.] drove to ■the crime scene' during the trial ‘so that he could better understand the evidence presented at trial.’ Dunaway contends [W.H.’s] visit to the crime scene prejudiced him ‘because [W.H.] was able to consider and to communicate to his fellow jurors extra judicial information that [Dunaway] had no opportunity to challenge or rebut.’
“At the time of the evidentiary hearing, [W.H.] was 88 years old and in failing health. When asked on direct examination if he went .to the crime scene while he was a juror, [W.H.] answered yes. [W.H.] said he saw where the baby was .burned and that the trailer was ‘burned pretty bad.’ In cross-examination, however, [W.H.] indicated that he thought he visited the trailer before Dunaway’s trial with a group of people. When asked by this Court whether he could have confused going to the crime scene with looking at pictures of it admitted into evidence, [W.H.] again said he went to the scene,
“[W.H.] appeared sure he went to the crime scene. What his testimony left unclear is when. There is nothing in the record indicating the jury went to the crime scéne during the trial. At the evidentiary hearing, [another juror] said she did not recall the jury going to the crime scene. [E.B.] and [another juror] emphatically said the jury did not go to the crime scene. The burden of proving that [W.H.] visited the crime scene during the trial rested entirely on Dunaway and his collateral counsel. See Ex parte Dawson, 710 So.2d 472, 475 (Ala.1997) (holding ‘a defendant seeking a new trial on the basis of juror misconduct has the initial burden to prove that-a-juror or jurors did in fact commit the alleged misconduct’). Because [W.H.’s] testimony was conflicting, to say the least, this Court cannot find that Dunaway has met his burden of proving this allegation of juror misconduct by a preponderance of the evidence as required by Rule 32.3, Ala. R.Crim. P.
“Moreover, even assuming [W.H.] improperly visited the crime scene during Dunaway’s trial, there was no evidence presented, at the evidentiary hearing affirmatively proving it affected [W.H.’s] verdicts or sentencing recommendations. Dunaway’s collateral counsel did not ask [W.H.] whether he considered his visit as evidence nor did they ask [W.H.] whether it had any affect on his verdicts or sentencing recommendations. Further, .Dunaway’s collateral counsel also did not elicit any testimony from any of *543 the other jurors or the alternate juror called at the June 20.04 hearing showing that [W.H.] had disclosed to them any information about the crime scene. None of the individuals called to testify at the June 2004 proceeding indicated [W.H.] ever disclosed any information from visiting the crime scene. See Reed v. State, 547 So.2d 596, 598 (Ala.1989) (holding that ‘[bjecause the defendant in this case has failed to show that the experiment [conducted by a juror] resulted in the introduction of facts that might have unlawfully -influenced the verdict rendered, we find that the juror’s action does not warrant a new trial’); see also Reynolds v. City of Birmingham, 723 So.2d 822, 826 (Ala.Crim.App.1998) (finding that juror misconduct did not warrant a new trial because ‘[t]he jurors in the present case all stated that they were basing their decision on the officers’ testimony rather than any statements of allegations coming from the investigating juror’); Ex parte Dawson, 710 So.2d at 476 (holding ‘[bje-cause Dawson failed to show that the juror’s viewing of the crime scene resulted in the introduction of facts that might have unlawfully influenced the jury’s verdict, a new trial is not warranted’).
■ “Even if this Court were to And Duna-way had met his initial burden of proving [W.H.] had committed misconduct, the Court concludes that Dunaway failed to meet his burden of proving he might have been prejudiced by this misconduct by a preponderance of evidence as required by Rule 32.3, Ala. R.Crim. P.” '
(C.R. 669-71.)
The circuit court’s findings are consistent with Alabama law. As we stated in Minshew v. State, 594 So.2d 703 (Ala.Crim.App.1991):
“ ‘Juror misconduct will justify a.-.new trial when it indicates bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law.’ Whitten v. Allstate Ins. Co., 447 So.2d 655, 658 (Ala.1984). As a general rule, ‘[w]here extraneous material [is] introduced into the jury’s deliberations, .., actual prejudice [must] be shown to work a reversal of the verdict.’ Nichols v. Seaboard Coastline Ry., 341 So.2d 671, 672 (Ala.1976). However, it is a light burden placed upon the defendant to show prejudice based on misconduct which might have influenced the verdict. Ex parte Troha, 462 So.2d 953, 954 (Ala.1984).”'
594 So.2d at 716.
W.H.’s testimony at the evidentiary hearing clearly indicates that he was very confused — a .condition not unusual for an individual who was 88 years old. W.H. could not definitively say when he visited the scene. Nor was W.H. asked what he saw as a result of that visit. It is unclear whether there was any misconduct in this case. Neither is there any indication that W.H. discussed his visit with any of his fellow jurors. “Because [Dunaway] failed to show that [W.H.’s] .viewing of the crime scene resulted in the introduction of facts that might have, unlawfully influenced the jury’s verdict,” Dunaway failed to establish that he is entitled to relief. See Dawson v. State, 710 So.2d 472, 476 (Ala.l997).
Moreover, Dunaway testified at trial that he accidentally shot Tressa and that he set her on fire because-voices told him to “send her. to hell.” He further stated that he did not know that the baby was in the trailer. Thus, the question for the jury was Dunaway’s, mental state at the time of the murders, not whether he set the trailer on fire.- We are confident that even if W.H. had visited the scene where the trailer was burned it would have had no effect on the proceedings.
*544 Accordingly, Dunaway failed to meet his burden of proof in regard to his claim related to juror W.H.
III.
Dunaway next argues that his counsel were ineffective at the penalty phase of his capital-murder trial. He cites several different grounds in support of this contention.
To prevail on a claim of ineffective assistance of counsel a petitioner must show: (1) that counsel’s performance was deficient; and (2) that the petitioner was prejudiced by counsel’s deficient performance. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2062, 80 L.Ed.2d 674 (1984).
“Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act ’or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34[, 102 S.Ct. 1558, 71 L.Ed.2d 783] (1982). A fair assessment of attorney perform-anee requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See Michel v. Louisiana, [350 U.S. 91], at 101[, 76 S.Ct. 158, 100 L.Ed. 83 (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
Strickland v. Washington, 466 U.S. at 689.
“[T]he purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington ], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [ (1984) ]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992) (We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.’). We recognize that ‘[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.’ Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or ‘what is prudent or appropriate, but only what is constitutionally compelled.’ Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).
“Because the reasonableness of counsel’s acts (including what investigations are reasonable) depends ‘critically’ upon ‘information supplied by the [petitioner]’ or ‘the [petitioner’s own statements or actions,’ evidence of a petitioner’s statements and acts in dealing with counsel is highly relevant to ineffective assistance claims. Strickland, 104 S.Ct: at 2066. *545 ‘[An] inquiry into counsel’s conversations with the [petitioner] may be critical to a proper assessment of counsel’s investigation decisions, just as it may be critical to a proper assessment of counsel’s other litigation decision's.’ Id. (‘[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable.’).”
Chandler v. United States, 218 F.3d 1305, 1313-19 (11th Cir.2000) (footnotes omitted).
With regard to claims of ineffective assistance of counsel related to the penalty phase of a capital murder trial, the United States Supreme Court in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), stated:
“In Strickland [v. Washington, 466 U.S. 668 (1984) ], we made clear that, to establish prejudice, a ‘defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ Id., at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.”
539 U.S. at 534.
Dunaway was represented at trial by attorneys Paul W. Brunson and Donald J. McKinnon.[4] Both attorneys testified at the postconviction proceedings.
A.
First, Dunaway argues that his trial counsel failed to investigate Dunaway’s life in Louisiana and Texas for purposes of the penalty phase. At the time of the murders Dunaway had resided in Alabama for approximately three months and had moved from Texas to Alabama with the victims.
In the section of Dunaway’s brief addressing this issue he makes á generalized claim that the statutory cap on fees for out-of-court work in a capital case denied counsel the ability to investigate Dun-away’s life in Louisiana and Texas. At the time of Dunaway’s trial the cap on fees for oüt-of-court work was $1,000. Section 15-12-21, Ala.Códé 1975, was amended in 1999 to lift the cap for out-of-court work'in capital-murder cases.
When denying relief on this claim, the circuit court stated:
“At the evidentiary hearing, Mr. [Paul] Brunson and Mr. [Donald] McKinnon expressed their belief .that the compensation for appointed attorneys in capital cases in effect at the time they represented Dunaway was inadequate. Both indicated they continued to do.legal work for which they were being paid while . representing Dunaway. Brunson testified he spent ‘a lot more hours than [he] was paid for’ in preparing for Dunaway’s trial. McKinnon indicated he also went over the cap for compensation and said he and Brunson did the best with what they had. McKinnon also indicated because of illness he did not submit a fee declaration.
“The Alabama Court of Criminal Appeals has observed that:
“‘These limitations on compensation have -withstood repeated challenges that they violate the separation of powers doctrine, constitute a taking without just compensation, deprive indigent capital defendants of the effective assistance of counsel, and deny *546 equal protection in violation of the Fifth, Sixth, Eighth, and Fourteen Amendments of the United States Constitution, the Alabama Constitution, and Alabama state law. See Ex parte Smith, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).’
“Samra v. State, 771 So.2d 1108, 1112 (Ala.Crim.App.1999).
“No doubt that with additional time and money Brunson and McKinnon could have done soniething more or different. The same could be said after any trial where a capital defendant was found guilty and sentenced to death, but ‘perfection is not the standard of effective assistance.’ Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir.1995). Mr. Brunson and Mr. McKinnon faced a daunting task defending Dunaway and both testified they spent far more hours preparing for Dunaway’s case than they were given compensation. The cap on personal compensation did not lessen Brunson’s and McKinnon’s vigor or zeal in their preparation arid presentation at Dunaway’s trial. See Bui v. State, 717 So.2d 6, 15 (Ala.Crim,App.1997) (holding we reject the notion that Alabama’s statutory scheme for compensating attorneys in capital cases, in and of itself, denies a defendant effective representation’).
“Based on this Court’s review of the record of Brunson’s and McKinnon’s efforts to represent Dunaway and the law in Alabama, the Court finds that Duna-
way’s allegation they were ineffective due to limits on their personal compensation is without merit. Rule 32.7(d), Ala. R.Crim. P.”
(C.R. 684-85.)
The circuit court’s findings are supported by the record and by Alabama, law. Brunson testified at the evidentiary hearing that he was appointed to Dunaway’s case sometime between the 72-hour hearing following Dunaway’s arrest and the preliminary hearing. ■ He said that he would have liked to have hired a private investigator but he knew from past experience that the circuit court would not approve that expense. ‘ He also said: “I spent a lot more hours than I actually got paid for.” (R. 24.) On cross-exámination Brunson testified that he worked closely with Dunaway and that he communicated with Dunaway’s family members. He also said that Dr. Fernando Lopez, who had been retained to evaluate Dunaway’s mental condition, contacted “certain hospitals and other organizations in Louisiana and got additional information”; that Dr. Lopez obtained information from a children’s Methodist home in Ruston, Louisiana; and that he also obtained Dunaway’s educational records. The two witnesses who testified at Dunaway’s penalty-phase hearing were from Louisiana, McKinnon testified that after he had completed the work on the case he did not submit an attorney-fee declaration because, he said, “I was facing a battle with cancer and I just let it go.” . (R. 37.) He did testify that he knew that the time he worked on the case exceeded the statutory cap and that he and Brunson did the best- that they could with their resources.
In Ex parte Grayson, 479 So.2d 76 (Ala.1985), the Alabama Supreme Court noted that a claim of ineffective assistance of counsel based on the statutory cap is
“made on the premise that lawyers will not provide effective assistancé unless paid a certain amount of money. But the legal profession requires its members to give their best efforts in ‘advancing the “undivided interests of [their] client[s].” ’ Polk County v. Dodson, 454 U.S. 312, 318-19, 102 S.Ct. 445, 449-50, 70 L.Ed.2d 509 (1981).”
*547 479 So.2d at 79-80. There is no indication that Dunaway was denied the effective assistance of counsel based on the then existing statutory cap for out-of-court work. The circuit court correctly denied relief on this claim.
B.
Dunaway next argues that his trial counsel failed to discover and present mitigation evidence. In the section of Dunaway’s brief addressing this issue, Dunaway 'separates the argument according to the mitigating evidence that he asserts counsel did not discover and present at the penalty phase.
“As an initial matter, we ‘must recognize that trial counsel is afforded broad authority, in determining what evidence will be offered in mitigation.’ State v. Frazier (1991), 61 Ohio St.3d 247, 255, 574 N.E.2d 483. We also reiterate that post-conviction proceedings were designed to redress denials or infringements of basic constitutional rights and were not intended as an avenue for simply retrying the case. Laugensen [Laugesen ] v. State, [(1967), 11 Ohio Misc. 10, 227 N.E.2d 663] supra; State v. Lott, [ (Nov. 3, 1994), Cuyahoga App. Nos. 66388, 66389, 66390] supra. Further, the failure to' present evidence which is merely cumulative to that which was presented at trial is, generally speaking, not indicative of ineffective assistance of trial counsel. State v. Combs (1994), 100 Ohio App.3d 90, 105, 652 N.E.2d 205.”
Jells v. Mitchell, 538 F.3d 478, 489 (6th Cir.2008).
“ ‘[C]oünsér is not required to present all mitigation evidence, even if the additional mitigation: evidence would not have been incompatible with counsel’s strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively.’ Haliburton v. Sec’y for the Dep’t of Corr., 342 F.3d 1233, 1243-44 (llth.Cir.2003) (quotation marks and citations omitted); see Herring v. Sec’y, Dep’t of Corr., 397 F.3d 1338, 1348-50 (11th Cir.2005) (rejecting ineffective assistance claim where defendant’s'móther was only mitigation' witness and counsel did not introduce evidence from hospital records in counsel’s possession showing defendant’s brain damage and mental retardation or call psychologist who evaluated defendant pre-trial as having dull normal intelligence); Hubbard v. Haley, 317 F.3d 1245, 1254 n. 16, 1260 (11th Cir.2003) (stating this Court has ‘consistently held that there is “no absolute duty ... to introduce mitigating or character evidence” ’ and rejecting claim that counsel were ineffective in failing to present hospital records showing defendant was in ‘borderline mentally retarded range’) (brackets omitted) (quoting Chandler [v: United States ], 218 F.3d [1305] at 1319 [ (11th Cir.2000) ]).”
Wood v. Allen, 542 F.3d 1281, 1306 (11th Cir.2008). “The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy.” Hill v. Mitchell, 400 F.3d 308, 331 (6th Cir.2005).
■ Initially, we note'that the record shows that both of. Dunaway’s trial attorneys were asked very few questions at the evidentiary hearing. Brunson’s direct examination consists of nine pages and McKinnon’s direct examination .consists of four pages. Neither attorney was asked why counsel presented the mitigating evidence they did or what investigation they conducted to discover mitigating evidence. “If the record is silent.as to the reasoning behind counsel’s actions, the presumption of effectiveness is sufficient to deny relief on ineffective assistance of counsel claim,” Howard, v. State, 239 S.W.3d 359, 367 (Tex.App.2007). Also, “Although Petitioner’s *548 claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact.” Chandler v. United States, 218 F.3d at 1320.
The record of Dunaway’s trial shows that at the penalty phase counsel offered the testimony of Dunaway’s father, Larry Dunaway, Sr., and Mary Marsh, the pastor of the church Dunaway had attended in Louisiana. Dunaway Sr. testified that Dunaway lived with him since, he was about five years old,, that he was a quiet child, that he was a pretty good boy,.that he was easily influenced by others, that he pretended to be a preacher and would sing, and that he was athletic and played basketball. Dunaway Sr. also testified that he himself had heard voices all of his life. He related several specific instances that had occurred as a result of those voices. He also said that he had often ignored Dunaway and seldom knew what the child was doing.
Marsh testified that Dunaway’s mother heard voices, that she had been with his mother when she heard voices, that his mother had threatened her because of the voices, that at one point his mother had destroyed the Dunaway home because of the voices, and that Dunaway’s mother had been placed in a psychiatric home in Monroe, Louisiana. She also testified that Dunaway’s mother could not help herself and that Dunaway had had no contact with his mother since he was five years old when his parents divorced and Dunaway lived with his father-. Marsh further -testified that Dunaway was a very unusual child and spent most of his time pretending to be a preacher, that his father heard voices and had frequently asked for her help with those voices, and that Dunaway was often neglected by his father. She further testified that Dunaway was very active in the church, that he had founded a gospel singing group, and that he was the church organist.
At the guilt phase, trial counsel presented the testimony of Dr. Fernando Lopez, a psychiatrist. He said that he had. talked to Dunaway four times before trial and had given him an IQ test and a personality test. Dr. Lopez testified that it was his opinion that Dunaway suffered from a mental illness — schizophrenia, the residual type.. He testified extensively about this condition and said that it was his opinion that Dunaway was suffering from schizophrenia at the time of the murders.
1.
• First, Dunaway argues that counsel were ineffective for failing to present evidence that his mother, Vickie Modest, suffered from paranoid schizophrenia.
In regard to this claim, the circuit court stated:
“At trial, Dunaway testified his mother suffered from paranoid schizophrenia and Dr. Lopez testified that Dunaway suffered from residual schizophrenia. The Court also notes Mr. Brunson argued in his guilt phase closing argument that Dunaway could have inherited his mental illness from his mother. Duna-way’s collateral counsel did not ask any juror if they did not consider the effect of this evidence simply because Brunson and McKinnon did not offer documentation to prove it.
“The Court finds that this allegation of ineffective assistance is without merit. Rule 32.7(d), Ala. R.Crim. P. In the alternative, the Court finds that Duna-way failed to meet his burden of proving this allegation of ineffective assistance by a preponderance of evidence as required by Rule 32.3, Ala. R.Crim. P.”
(C.R. 732.)
As stated above, Marsh testified that Dunaway’s mother heard voices, that she *549 had been with his mother when she heard voices, that his mother had threatened her because of the voices, that at one point she destroyed their home because of the voices, and that Dunaway’s mother had been placed in a psychiatric home in Monroe, Louisiana. Dunaway Sr. also testified that his wife had heard voices. Dunaway testified in his own defense at the guilt phase that his mother was a paranoid schizophrenic. , •
There was evidence presented that Dun-away’s mother had a mental problem and had been institutionalized. We agree with the circuit court that Dunaway failed to show prejudice in counsel’s failure to present more evidence regarding his mother’s mental health. See Strickland.
2.
Second, Dunaway argues that counsel should have presented evidence about the violence in his home when he was a child and his parents’ volatile relationship.
The circuit court stated:
“At the evidentiary hearing, Vickie Modest [Dunaway’s mother] testified about the domestic abuse she suffered at the hands of Dunaway Sr. Sister Marsh also testified about what Dunaway Sr. had confided in her. Dunaway’s brother, Hiram Dunaway, also said that his mother and father had an abusive relationship and fought constantly. As an example, Hiram testified about an incident where his mother threatened to stab his father with a knife.
“The trial 'testimony of Marsh and Dunaway Sr. gave the jury and trial court more than sufficient evidence from which they could conclude Dunaway’s parents had a bad marriage that ended in divorce. The Court finds that Duna-way failed to meet his burden of proving he was prejudiced because his trial counsel did not present more testimony about his parents’ turbulent relationship. Rule 32.3, Ala. R.Crim. P.”
(C.R. 751-52.)
■ Dunaway Sr. testified at trial that he and his wife split when Dunaway was about five years old and that Dunaway and another son, Hiram, lived with him and that the other children lived with their mother. Marsh testified that Dunaway had no mother in his life since he was five years old. - Based on the testimony that was presented, we cannot say that Duna-way’s failure to present evidence about his parent’s “volatile relationship,” given that they separated when Dunaway was five year's old, resulted in any prejudice to him. See Strickland. ’
'3.
Third,- Dunaway argues that counsel should have’presented testimony about his father’s mental illness and the poverty and neglect Dunaway suffered as a child.
The circuit court stated: .
“As previously stated, the testimony at Dunaway’s evidentiary hearing shows that he was reared in an environment lacking in material luxury. ■ Dunaway’s father appears tó have had a good job but spent a lot of his money on gambling and women. Many people, however, have come from surroundings similar to those Dunaway' endured and did not go on to committing capital murder. This Court is convinced the reason for a majority of the jurors recommending Duna-way receive [death] for the capital murder of James Patterson were the horrific facts surrounding the incident. The Court finds that, even if Brunson and McKinnon had presented evidence of Dunaway’s socio-economic background at the penalty phase- similar to that presented at the evidentiary hearing, there *550 is no reasonable probability it would have caused a different result.”
(C.R. 759-60.)
As stated above, Dunaway Sr. testified at the penalty phase that he had heard voices all Of his life. H¿ also testified that he had often ignored Dunaway and seldom knew what the child was doing. Marsh testified that Dunaway’s parents divorced when he was about five years old, that Dunaway was a very unusual child who spent most of his time pretending to be a preacher, that his father heard voices and had frequently asked for her help with those voices, that Dunaway’s mother had been placed in a psychiatric home in Monroe, Louisiana, that Dunaway had no mother figure in his life since he was five years old, and that Dunaway was often neglected by his father.
“ ‘Prejudicial ineffective assistance of counsel under Strickland cannot be, es-. tablished on the general claim that additional witnesses should have been called in mitigation. See Briley v. Bass, 750 F.2d 1238, 1248 (4th Cir.1984); see also Bassette v. Thompson, 915 F.2d 932, 941 (4th C&.1990)., Rather, the deciding factor . is whether additional witnesses would have made any difference'in the mitigation phase of the trial.’ Smith v. Anderson, 104 F.Supp.2d 773, 809 (S.D.Ohio 2000), aff'd, 348 F.3d 177 (6th Cir.2003). ‘There has never been a case where additional witnesses could not have been called,’ State v. Tarver, 629 So.2d 14, 21 (Ala.Crim.App.1993).”
McWilliams v. State, 897 So.2d 437, 453 (Ala.Crim.App.2004), rev’d on other grounds in Ex parte Jenkins, 972 So.2d 159 (Ala.2005).
Counsel did present evidence of Duna-way’s father’s mental illness and his fathers neglect, We cannot say that counsel’s failure to present evidence of the poverty in which Dunaway was raised resulted in any prejudice to him. See Strickland v. Washington. ■ .
4.
Fourth, Dunaway argues that counsel was ineffective for failing to present evidence of his mental illness. Specifically, he asserts that counsel should have presented documentary evidence of his mental illness.
The circuit court stated:
“During the defense’s .case-in-chief, Dr. Lopez testified extensively about Dunaway’s mental illness and its effect on his actions leading up to the murders. Lopez[’s] testimony included a vigorous cross-examination by the prosecutor. Lopez stated that, at the time Dunaway committed the murders, he suffered from residual schizophrenia. Lopez concluded his direct testimony by stating that:
“ ‘In my medical opinion, based on all the studies, reports, evaluations from previous places, certain history, and psychiatric examination, psychological testing, and the diagnosis is I believe that he is suffering from a mental illness, and as such his . behavior, although he knows the difference between right and wrong, at the time of the incident he could not perceive the wrongfulness of his acts. He was under psychiatric difficulties at the moment.’
“In addressing substantially the same underlying issue on direct appeal, the Alabama Court of Criminal Appeals concluded that Dunaway’s trial counsel had, in fact, presented ‘some evidence that created doubt about his mental state at the time of the murders’, but thqt:
“ ‘Based on the conflicting expert testimony concerning [Dunaway’s] sanity, testimony of lay witnesses .that [Dunaway] appeared.to be. sane, and *551 [Dunaway’s] testimony and demeanor at trial, the .jury could have reasonably concluded that [Dunaway] was sane at the time of the murders.’
“Dunaway v. State, 746 So.2d [1021] at 1034 [ (1998) ].
“Based on evidence presented by Dunaway’s trial counsel and the holding of the Alabama Court of Criminal Appeals, the Court finds that this allegation of ineffective assistance is without merit. Gibby v. State, 753 So.2d 1206, 1207-1208 (Ala.Crim.App.1999) (holding that a post-conviction claim that is refuted by the record is without merit). In the alternative, the Court finds that Dunaway failed to meet liis burden of proving this allegation of ineffective assistance by a preponderance of evidence as required by 'Rule 32.3, Ala. R.Crim. P.”
(C.R. 726-29.)
Dunaway testified in his own defense at his capital-murder trial. He said that he had been hearing voices since he was a child and that at the time of the murders he was depressed. He said that he, Tres-sa, and the baby were sitting in the mobile home and he was playing with a gun and pressing it to his head. Dunaway said that the trigger accidentally went off, and “Voices told him to,send her to hell.”. (Trial record at page 525.) He had-no control over his actions, he said, and he forgot that the baby was in the mobile home. In Duna-way’s statement to police he said that after he accidentally shot Tressa he poured rubbing alcohol on her and set her on fire.
Dr. Lopez testified at Dunaway’s trial that he had evaluated Dunaway and had given him an IQ test and a personality test. Dr. Lopez testified that it was his opinion that Dunaway suffered from a mental illness — schizophrenia, the residual type — that, he was suffering from schizophrenia at the time of the murders.
Evidence of Dunaway’s mental condition was presented at trial. We cannot say that .Dunaway was prejudiced by the fact that counsel did not submit documents to establish his mental problems. Dunaway failed to satisfy the requirements of Strickland. :
5.
Fifth, Dunaway argues that Counsel was ineffective for failing to present evidence that Dunaway thrived in a structured environment. He cites Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), to support this contention.
The circuit court stated the following in regard to this claim:
“This Court is convinced beyond any doubt that if Dunaway’s trial counsels had presented evidence of Dunaway’s good behavior while at the Children’s Home or while he was incarcerated in Louisiana and Alabama the outcome of the. jury’s-recommendation and the trial court’s sentence for the capital murder of James Patterson would have been the same. The Court finds that this allegation of ineffective assistance is without merit. Rulé 32.7(d),' Ala. R.Crim. P.”
(C.R. 760-62.)
In Skipper, defense counsel sought to introduce evidence that the defendant had made a good adjustment to prison life. The trial court excluded that, evidence. The United States Supreme Court held that the trial court had erred in excluding the evidence because, it said, any aspect of the defendant’s good character Was admissible in the sentencing hearing of a capital case. However, the issue here is not the same issue , as the issue in Skipper. Here, the issue is whether counsel was ineffective for: failing to present evidence that Dunaway responded well in, a structured environment. ,
*552 “[C]ounsel could have introduced testimony from jail and prison officials, for evidence like that may not be barred at a capital sentencing hearing. Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Skipper did not also hold, however, that counsel must be deemed ineffective for failing to present available testimony of that nature.”
People v. Szabo, 186 Ill.2d 19, 29, 237 Ill.Dec. 66, 708 N.E.2d 1096, 1102 (1998).
“Under Skipper, this evidence would undoubtedly have been admissible, but the question before me is whether counsel can be found ineffective for failing to introduce it. The Eighth Circuit has cautioned that Skipper cannot be read to require counsel to present all possible mitigating evidence. See Skillicom v. Luebbers, 475 F.3d 965, 976 (8th Cir.2007).”
Cole v. Roper, 579 F.Supp.2d 1246, 1283 (E.D.Mo.2008).
We, like the circuit court, cannot say that the failure to present this evidence prejudiced Dunaway. Thus, Dunaway failed to satisfy the Strickland test in regard to this claim.
6.
Sixth, Dunaway argues that counsel was ineffective for failing to present evidence in mitigation of his prior conviction for carjacking.
This issue was not raised in Duna-way’s consolidated amended Rule 32 petition. Therefore, it is not properly before this Court. “An appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.” Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997).
7.
Seventh, ' Dunaway argues that counsel was ineffective for failing to present evidence of his good character, which consisted of testimony from his family members and friends that he was a loving brother and friend, respectful, and loyal.
First,
. “ ‘As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias.’ Bergmann v. McCaughtry, 65 F.3d 1372, 1380 (7th Cir.1995).
“ ‘Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are “virtually unchallengeable.” [Strickland v. Washington, 466 U.S. 668] at 690, 104 S.Ct. 2052 [ (1984) ]. Tactical or reasonable professional judgments are not deficient but a failure to investigate a material matter due to inattention may be deficient. When the claim is that counsel failed to present a sufficient mitigating case during sentencing, the inquiry “is not whether counsel should have presented a mitigation case” but “whether the investigation supporting counsel’s decision not to introduce mitigating evidence ... was itself reasonable.” See Wiggins [v. Smith ], 539 U.S. [510] at 523, 123 S.Ct. 2527 [(2003)] (internal citations omitted).’ ”
Davis v. State, 44 So.3d 1118, 1141 (Ala.Crim.App.2009), quoting Powell v. Kelly, 562 F.3d 656, 670 (4th Cir.2009). It is not per se ineffective assistance of counsel not to present good-character witnesses. See Commonwealth v. Buehl, 510 Pa. 363, 508 A.2d 1167 (1986). In fact, counsel may make a strategic decision not to present good-character evidence. See Brooks v. State, 929 So.2d 491, 511 (Ala.Crim.App.2005).
*553 “ ‘Strickland cautions that “there are countless ways to provide effective assistance in a given case” and that “even the best criminal defense attorneys would not defend the particular client the same way.” 466 U.S. at 689, 104 S.Ct. 2052. Among the- “virtually unchallengeable” tactical decisions left to the judgment of trial counsel are determinations regarding the defense strategy adopted at trial.’”- -
Brooks v. State, 929 So.2d at 509, quoting Gluzman v. United States, 124 F.Supp.2d 171, 174 (S.D.N.Y.2000).
At the evidentiary hearing, Dunaway presented the testimony of various family members and friends.
Family members. Vickie Modest, Dun-away’s mother, testified that she was 17 years old when she married Dunaway Sr. and that her husband drank and would beat her. She said that Dunaway had problems growing up, that he was in a “Head Start” program, but, she said, she did not know what Dunaway’s problems were. Joseph Dunaway, Dunaway’s uncle, testified that after Dunaway’s parents divorced he would visit Dunaway because he knew that the kids were looking after themselves. He said’that their home was “pretty shabby,” that the kids had no adult supervision, and that Dunaway’s mother had psychiatric problems. Bryan Duna-way, Dunaway’s brother, testified that he was raised by his mother, that he would visit his father, that the children had no supervision in his father’s household, and that his mother had been hospitalized. He said that Dunaway was athletic and that he could sing. Derrick Modest, Duna-way’s younger brother, testified that his mother would beat them. Hiram Duna-way, Dunaway’s older brother, testified that his mother was abusive, that his father was rarely at home, and that he and Dunaway raised themselves. Angela Dun-away, Dunaway’s stepmother, testified that Dunaway was seven years old when he was living with her, that they liyed in a mobile home that was not “very pleasant,” that Dunaway Sr. was irresponsible, that he never spent time with Dunaway, and that ■ she left Dunaway Sr. after he cheated on her. Cornelius' Dunaway, Dunaway’s brother, testified that he was raised by their mother and that he would visit Duna-way.
Friends. Marsh’s testimony at the Rule 32'hearing was similar to her trial testimony. She offered a little more detail about the instance where Dunaway’s mother destroyed the home they were living in. Bobby Hill, Dunaway’s childhood friend, testified that as a child he" lived across the street from Dunaway, that Dunaway’s father was rarely at home, and that Duna-way was athletic, talented, and could sing. Romesa Modest testified that- she ■ dated Dunaway Sr., - that she moved into his house when Dunaway was about 13 or 14 years old, that Dunaway was often dirty, and that Dunaway’s father spent most of his money gambling. She said that Duna-way was talented and could sing.
Dr. Karen Salekin, a clinical psychologist, testified that having a mother who is a paranoid schizophrenic is a “risk factor.” She testified that a “risk factor” “puts people at risk for problems in their development.” (R. 124.) Dr. Salekin also testified that she had not spoken with Dunaway but that she was testifying in generalities. (R. 138.) Marilyn Roma-nouski, a clinical social- worker, testified about the impact of the events in Duna-way’s life on his development.
In light of the evidence presented at Dunaway’s trial, the testimony offered at the evidentiary hearing was not compelling. A great deal of the testimony was cumulative of the trial testimony of Dr. Lopez, Dunaway Sr., and Mary Marsh.
*554 .“The testimony of these witnesses was generally cumulative to that presented at the penalty phase. See Teffeteller v. Dugger, 734 So.2d 1009, 1021 (Fla.1999) (‘Much of the mitigating evidence that [defendant] faults counsel for not presenting is cumulative to that presented by the mental health expert and [defendant] during the resentencing proceeding.’); Routly v. State, 590 So.2d 397, 401 (Fla.1991) (finding that defendant did not demonstrate reasonable probability that sentence would have been different where much of the proffered mitigating evidence was already before the judge and jury in a different form). Trial counsel’s performance was not deficient simply because he did not present cumulative evidence. See Cole v. State, 841 So.2d 409 (Fla.2003) (rejecting ineffective assistance of counsel claim where counsel did not. present cumulative evidence- of defendant’s drug, problem); Valle v. State, 705. So.2d 1331, 1334-35 (Fla.1997) (rejecting ineffective assistance claim based on trial counsel’s failure to present cumulative.evidence).”
Duckett v. State, 918 So.2d 224, 236-37 (Fla.2005). Also as we stated in Davis v. State, 44 So.3d 1118, 1141 (Ala.Crim.App.2009):
“ ‘As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias.’ Bergmann v. McCaughtry, 65 F.3d 1372, 1380 (7th Cir.1995).
“ ‘Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are “virtually unchallengeable.” - [Strickland v. Washington, 466 U.S, 668] at 690, 104 S.Ct. 2052 [ (1984) ]. Tactical or reasonable professional judgments are not deficient but a failure to investigate a material matter due to inattention may be deficient. When the claim is that counsel failed to present a sufficient mitigating case during sentencing, the inquiry “is not whether counsel should have presented a mitigation case” but “whether the investigation supporting counsel’s decision not to introduce mitigating evidence ... was itself reasonable.” See Wiggins [v. Smith], 539 U.S. [510] at 523, 123 S.Ct. 2527 [ (2003) ] (internal citations omitted).’ ”
Quoting Powell v. Kelly, 562 F.3d 656, 670 (4th Cir.2009), “Which witnesses, if any, to call, and when to call them is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess.” Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir.1995).
Here, the jury recommended, and the court agreed, that Dunaymy be sentenced to life imprisonment without the possibility of parole for the murder of Tressa and to death for the murder of James. The circuit court noted in its order that the distinction between the two murders-was that James’s murder was especially heinous, atrocious, or cruel because he was alive when the fire was started.
We have reweighed the alleged omitted mitigating evidence against the aggravating circumstances presented and are confident that there would be no change in the result in this case. See Wiggins v. Smith, 539 U.S. at 534. Accordingly, Dunaway was due no relief on this claim.[5]
*555 IV.
Dunaway next argues that the circuit court erred in finding that he failed to meet his burden of establishing that one of his attorneys had a conflict of interest. Specifically, he argues that attorney Paul Brunson simultaneously represented both Dunaway and a cousin of Tressai Patterson, one of the victims, in an unrelated case and that Brunson also represented a State’s witness, Don Dykes, in a divorce case..
When addressing this claim, the circuit court stated:
“Dunaway contends that Brunson’s representation of prosecution witnesses Don Dykes and Marcus Russaw at the same time Brunson represented him caused Brunson to be ineffective. Dun-away also contends that the trial court should have inquired into. Brunson’s possible conflict because Brunson had represented Dykes in his divorce. In paragraphs 50 and 51, Dunaway contends that, although Dykes’s testimony was ‘very damaging5, Brunson did not impeach Dykes with evidence that his estranged wife had reported to police that he had threatened her life. Dunaway’s collateral counsel offered certain exhibits at the evidentiary hearing in an effort to prove Brunson had an actual conflict of interest. " Petitioner’s Exhibits 14, 16, 24, 25, and 26 were admitted and considered by the Court.1 Petitioner’s Exhibits 13, 15, 17-19, 21-22 were not admitted by the Court but' made part of the record for purposes of appeal. Petitioner’s Exhibit 23 was not admitted by the Court and was ultimately withdrawn by Dunaway’s collateral counsel.
“In Williams v. State, 574 So.2d 876, 878 (Ala.Crim.App.1990), the Alabama Court of Criminal Appeals held:
“ ‘... [U-jnder Strickland, to prevail on a conflict of interest claim the petitioner must show: (1) an actual conflict of interest (2) that “adversely affected” his counsel’s representation.
“ ‘Moreover,-in- a case alleging ineffectiveness for counsel ' through a conflict of interest from successive representation, mere proof that a criminal defendant’s counsel previously represented a .prosecution witness is insufficient to establish inconsistent interests, and a defendant must show either that his ■ counsel’s earlier representation of ,the witness was substantial and particularly related to counsel’s later representation of the defendant, or that counsel actually learned particular confidential information during prior representation of the witness that was relevant to the defendant’s case,’
“At Dunaway’s trial, Don Dykes testified that he owned the trailer where Dunaway lived, that it was destroyed by the fire, and that he did not see Duna-way act unusual. Dykes testimony was corroborated by other witnesses. Annie McCoy, Tressa Patterson’s mother, testified she rented the trailer from Dykes and .that she never saw Dunaway acting out of the'ordinary. Ed Paulk, a Deputy State Fire Marshall, testified concerning the extent of the damage to the .trailer. John Phillips, a neighbor of Dunaway and Patterson’s, testified that Dunaway looked normal the night of the fire.
“Dunaway’s collateral counsel did not ask Mr. Brunson a single question about his representation of Dykes. In addition, Dunaway provided the Court with no statutory or legal authority that would have permitted Dykes to be impeached with evidence of alleged *556 threats he made to his estranged wife. .Rule 608(b), .Ala. R. Evid., specifically would have- forbidden the use of specific instances of bad conduct to impeach a witness’s credibility , unless such conduct resulted in a conviction. See also Rule 609(a), Ala. R. Evid. The Court finds that Dunaway failed to prove that Brunson’s representation of Dykes in a divorce created an actual conflict of interest or adversely affected Brunson’s representation.- Rule 32.3, Ala. R.Crim. P. See M.S. v. State, 822 So.2d 449, 452 (Ala.Crim.App.2000) (holding ‘[t]he burden of proving that a conflict of interest rises to the level- of ineffective assistance rests on the one asserting the conflict’).
“The Court finds that this allegation of ineffective assistance is without merit. Rule 32.7(d), Ala. R.Crim. P. In the alternative, the Court finds that Duna-way failed to meet his burden of proving by a preponderance of evidence that Brunson’s representation of Dykes in an unrelated case caused Brunson to be ineffective as required by Rule 32.3, Ala. R.Crim. P.
“... [Dunaway] also contends that Mr. Brunson had a conflict of interest because he represented State’s witness Marcus Russaw on a pending attempted murder charge. According to Duna-way’s collateral counsel, Marcus Russaw was Tressa Patterson’s first cousin.' In his consolidated Rule 32 petition, Duna-way contends that Mr. Brunson did not cross-examine Mary Russaw at all and conducted only cursory cross-examinations of Lois Russaw, Felicia Russaw, and Teresa Russaw because they were going to be -witnesses at Marcus Bus-saw’s trial.
“At the evidentiary hearing, Duna-way’s collateral counsel offered court records indicating Mr. Brunson was appointed in November 1996 to represent Michael Russaw in a case that was ulti- . mately nol prossed by the State. Duna-way’s collateral counsel did not, however,, ask Mr; Brunson a single; question about his representation of Marcus Rus-saw or Michael-Russaw. Dunaway’s collateral counsel also failed to offer this Courp any 'information Brunson could ■have used to impeach the trial testimony of Marcus Russaw, Mary Russaw, Lois Russaw, Felicia Russaw, or Teresa Rus-saw. Further, Dunaway’s collateral counsel did not call any of the Russaws to testify at the evidentiary hearing.
“The Court finds that this allegation of ineffective assistance is without merit. Rule 32.7(d), Ala. R.Crim. P. In the alternative,- the Court finds that Duna-way failed to meet his burden of proving this allegation of ineffective assistance by a prepondérance of evidence as required by Rule 32.3, Ala. R.Crim. P. See M.S. v. State, 822 So.2d 449, 452 (Ala.Crim.App.2000) (holding ‘[t]he burden of proving that a conflict of interest rises to the level of ineffective assistance rests on the one asserting the conflict’).”
(C.R. 743-46.)
We agree with the circuit court that counsel failed to meet his burden of proof in regard to this claim. Brunson was asked no questions regarding this claim, nor was any witness questioned about this claim. Dunaway appeared to assert that prejudice was presumed based on Brun-son’s joint representation of the defendant and a state witness. However, that is not the law.
In Wimberly v. State, 934 So.2d 411, 418 (Ala.Crim.App.2005), we stated: “By far, the majority of states that have addressed this issue have likewise held that there is no per se ban on the joint representation of both a state witness and a defendant.” The United States Supreme *557 Court in Cuyler v. Sullivan, 446 U.S. 835, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), held that “the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer’s performance.”
“To prove that an actual conflict adversely affected his counsel’s performance, a defendant must make a.factual showing ‘that his counsel actively represented conflicting interests,’ Cuyler v. Sullivan, 446 U.S. [335] at 350, 100 S.Ct. [1708] at 1719 ([1980]), ‘“and must demonstrate that the attorney ‘made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.’ ” ’ Barham v. United States, 724 F.2d 1529, 1532 (11th Cir.[1984]) (quoting United States v. Mers, 701 F.2d 1321, 1328 (11th Cir.1983)), cert. denied, 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984).”
Molton v. State, 651 So.2d 663, 669 (Ala.Crim.App.1994). “Furthermore, a defendant must show that his lawyer made a choice between plausible courses of action, such as presenting arguments or evidence helpful to one client but harmless to the other.” United States v. Khoury, 901 F.2d 948, 968 (11th Cir.1990).
Dunaway made no attempt to satisfy his burden of proof in regard to this claim. Accordingly, we agree with the circuit court that Dunaway was due no relief on this claim.
V.
Dunaway next argues that his counsel was ineffective for failing to move to suppress his statement because, he argues, it was the product of an illegal arrest.[6]
The circuit court stated:
“Dunaway’s collateral counsel did not ask Brunson or McKinnon a single question about their attempt to suppress Dunaway’s statement or his arrest. The only testimony at the evidentiary hearing concerning Dunaway’s arrest came from Jodi Hatcher. Hatcher testified that .the night of the murders Dunaway came to her house and the police came and took Dunaway away in handcuffs. Hatcher said she did not know why Dun-away was taken by police.”
(C.R. 688.) Dunaway failed to meet his burden of proof concerning this claim. There was no evidence presented at the hearing concerning the circumstances surrounding Dunaway’s arrest. “The burden of proof of a post-conviction allegation is on the petitioner, Montalvo v. State, 488 So.2d 25 (Ala.Cr.App.1986), and this Court will not presume error from a silent record. Robinson v. State, 444 So.2d 884 (Ala.1983).” McCollough v. State, 678 So.2d 199, 200-01 (Ala.Crim.App.1995).
VI.
Dunaway next argues that his counsel was ineffective for “numerous other grounds.”
A.
First, Dunaway argues that counsel’s argument in the penalty phase was ineffective because, he says, counsel failed to make a “cogent argument” as to why the jury should sentence Dunaway to life imprisonment without the possibility of parole. The circuit court found that Duna-way had abandoned this claim because he *558 did not question McKinnon -about his closing argument.
At the penalty phase, McKinnon argued that the State failed to prove the aggravating circumstance that the murders were especially heinous, atrocious, or cruel when compared to other capital offenses. He further argued that Dunaway had no significant history of prior criminal activity, that he was mentally disturbed, that he did not have the capacity to commit the crime, and that he was only 20 years old when the crime occurred. He .also argued that the jury could consider anything in mitigation. Counsel vigorously asserted that the mitigating circumstances outweighed the aggravating circumstances. Counsel was not ineffective in his closing argument-in'the penalty phase. ■
B.
Second, Dunaway argues that counsel was ineffective for failing to make an adequate Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L,Ed.2d 69 (1986), objection to the prosecutor’s use of its peremptory strikes.
The circuit court stated the following in regard to this claim:
“Dunaway’s trial counsel did not make •a formal motion at trial pursuant to Batson v. Kentucky, [476 U.S. 79 (1986) ]. The record indicates, however, the trial court was present during the striking of the jury and required the prosecutor to state his reasons for his peremptory strikes after each strike. The trial court was fully aware of the race of each person struck by the prosecution and their age. The trial court would have also been aware of the extent of the prosecution’s voir dire. The Court also notes that a juror questionnaire was used by the parties, which would have negated the need for the prosecution to ask questions that were already answered.
“Dunaway cites this Court to one case, Morrison v. Jones, 952 F.Supp. 729 (M.D.Ala.1996), in support of his contention the Barbour 'County District Attorney’s Office has a history of racial discrimination in jury selection. This Court will not find a ‘pattern of discrimination’ based on one case out of the thousands criminal cases that have been prosecuted in Barbour County.
“Moreover, on -Dunaway’s direct appeal to the Alabama Supreme Court, he raised' the exact grounds in the underlying substantive claim that he now advances in his second amended petition. Ex parte Dunaway, 746 So.2d [1042] at 1044 [ (Ala.1999) ]. The Alabama Supreme Court held:
“ ‘After thoroughly examining the record, we find no error on the trial court’s part in accepting the State’s reasons for its strikes. We find those reasons to be race-neutral; therefore, we hold that Dunaway is not entitled to a new trial on the basis of the rule stated in Batson,’
“Ex parte Dunaway, 746 So.2d at 1046. Dunaway did-not present any evidence at the evidentiary hearing that would conflict with the findings of the trial court or the Alabama Supreme Court.
“The Court finds this allegation of ineffective assistance is without merit. Rule 32.7(d), Ala. R.Crim. P.”
(C.R. 686-87.)
In its opinion on Dunaway’s direct appeal, the Alabama Supreme Court noted that although the prosecutor used a large number of its peremptory strikes to remove black prospective jurors, Dunaway’s jury consisted of six white jurors and six black jurors. Also, the prosecutor’s reasons for striking the jurors were contained in the record. The Supreme Court specifi *559 cally found that the reasons given by the prosecutor were race neutral. “Counsel cannot be held ineffective for failing to raise an issue that has no merit.” Smith v. State, 71 So.3d 12, 23 (Ala.Crim.App.2008). Dunaway was due no relief on this claim.
C.
Third, Dunaway argues that counsel was ineffective for failing to object to what he alleges was prosecutorial misconduct. Specifically, he argues that counsel should have objected to the prosecutor’s closing argument concerning Dunaway’s theory that the gun used to kill Tressa Patterson accidentally'fired.
The circuit court found that Dunaway had abandoned this claim because counsel was not asked any questions about the argument.
“The fact that the counsel did not object at every possible instaiicé does not mean that the appellant did not receive adequate representation. O’Neil v. State, 605 So.2d 1247, 1250 (Ala.Cr.App.1992). Objections are a matter of trial strategy, and an appellant must overcome the presumption that ‘counsel’s conduct falls within the wide range of reasonable professional assistance,’ that is, the presumption that the challenged action ‘might be considered sound trial strategy.’ Strickland, 466 U.S. at 687-88,104 S.Ct, at 2064, 80 L.Ed.2d at 693. (1984).”
Moore v. State, 659 So.2d 205, 209 (Ala.Crim.App.1994). “A competent trial attorney might well eschew objecting ... in order to minimize jury attention to the damaging material.” United States v. Payne, 741 F.2d 887, 891 (7th Cir.1984). “[Counsel] could reasonably have decided not to risk antagonizing the jury by objecting, or he could have decided that his best strategy was to let his own closing argument (recited before the States’) speak for itself.” Wiley v. Puckett, 969 F.2d 86, 102 (5th Cir.1992). Accordingly, it could have been a strategic decision to not object to the prosecutor’s argument.
Moreover, counsel were not asked why they did not object to the prosecutor’s argument. In fact, counsel were asked no questions concerning closing arguments.
“‘An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore “where the record is incomplete or unclear about [counsels actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.” ’ Chandler v. United States, 218 F.3d 1305/1314 n. 15 (11th Cir.2000) (en banc) (quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir.1999)).” "
Grayson v. Thompson, 257 F.3d 1194, 1218 (11th Cir.2001). Dunaway was due no relief on this claim.
D.
Fourth, Dunaway argues that counsel was ineffective for failing to object to his appearance before the jury in shackles.
The circuit court stated the following concerning this claim:
“The only testimony at the evidentiary hearing about Dunáway being seen in restraints was elicited from alternate juror [M.B.]. When asked by Dunaway’s collateral counsel, [M.B.] indicated she saw Dunaway in handcuffs.
“In Baker v. State, 906 So.2d 210, 260 (Ala.Crim.App.2001), rev’d on other grounds, Ex parte Baker, 906 So.2d 277 (Ala.2004), the appellant raised a similar
issue alleging that:
“‘[h]e was unable to receive a fair trial after he had allegedly been par *560 aded in front of the jury in handcuffs and shackles, escorted by a large number of deputies. No objection as to this matter appears in the record and no reference to its having occurred appears in the record.’
“The Alabama Court of Criminal Appeals went on to find that ‘ “[i]t is not ground for mistrial that the accused appeared before the jury in handcuffs when his appearance was only part of going to and from the courtroom.” ’ Justo v. State, 568 So.2d 312, 318 (Ala.Crim.App.1990), quoting Cushing v. State, 455 So.2d 119, 121 (Ala.Crim.App.1984).
“Dunaway failed to cite to anywhere in the record indicating he appeared before the jury during his trial in handcuffs and shackles. Further, [M.B.] was excused before guilt phase deliberations began and gave no indication she discussed seeing Dunaway in handcuffs with other jurors or, that other jurors told her they saw Dunaway in handcuffs.
“The Court finds that Dunaway failed to meet his burden of proving this allegation of ineffective assistance by a preponderance of evidence as required by Rule 32.3, Ala. R.Crim. P.”
(C.R. 724-25.)
The circuit court’s findings are supported by the record. ‘Where there has been only a brief and inadvertent confrontation between a shackled person and one or more members of the jury, this is likely to be viewed as an insufficient showing of prejudice to require the reversal of a conviction.” 3 LaFave and Israel, Criminal Procedure § 23.2(d) (1984). See also An-not., Propriety and Prejudicial Effect of Gagging, Shackling, or Otherwise Physically Restraining Accused During Course of State Criminal Trial, 90 A.L.R.3d 17 (1979).
The only evidence presented to support this claim was M.B.’s testimony at the evidentiary hearing that she saw Dunaway in handcuffs. M.B. was asked no other questions concerning when this occurred or whether she discussed this with any other jurors. Also, M.B., an alternate juror, was excused before deliberations. Clearly, Dunaway failed to meet his burden of proof in regard to this claim.
VIL
Dunaway next argues that the United States Constitution prohibits the imposition of sentence of death as to him because, he argues, he is mentally retarded.
First, Dunaway asserts that under the doctrine of collateral estoppel the State is barred from arguing that Dun-away is not mentally retarded because the circuit court found in its sentencing order that. Dunaway is mentally retarded.[7].
Alabama has not addressed this specific issue, so we have looked to other states. The Ohio Court of Appeals in State v. Hill, 177 Ohio App.3d 171, 184, 894 N.E.2d 108, 118 (2008), stated:
“Because mental retardation did not preclude the imposition of the death penalty at the time of [the appellant’s] sentencing, the state did not have ‘a full and fair opportunity to litigate’ the issue during the penalty phase of Hill’s trial, as is necessary before collateral estoppel may be applied. Bies [v. Bagley ], 519 F.3d [324] at 338 [ (6th Cir.2008) ], citing *561 N.A.A.C.P. Detroit Branch v. Detroit Police Officers Assn. (C.A.6, 1987), 821 F.2d 328, 330; Goodson [v. McDonough Power Equipment, Inc.], 2 Ohio St.3d [193] at 201, 2 OBR 732, 443 N.E.2d 978 [ (1983) ] (‘an absolute due process prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action’).
“ ‘Collaterally estopping a party from relitigating an issue previously decided against it violates due process where it could not be foreseen that the issue would subsequently be utilized collaterally, and where the party had little knowledge or inceptive to litigate fully and vigorously in the first action due to the procedural and/or factual circumstances presented therein.’ Goodson, 2 Ohio St.3d at 201, 2 OBR 732, 443 N.E.2d 978;. State ex rel. Westchester Estates, Inc. v. Bacon (1980), 61 Ohio St.2d 42, 15 0.0.3d 53, 399 N.E.2d 81, at paragraph two of the syllabus (‘[w]here there has been a change in the facts since a decision was rendered in an action, which either raises a new material issue or which would have been relevant to the resolution of a material issue involved in the earlier action, neither the doctrine of res judicata nor the doctrine of collateral estoppel will bar litigation of that issue in a later action’).
“In the present case, the state did not have the knowledge or incentive to vigorously litigate the issue of Hill’s mental retardation, because that issue was only tangentially relevant to whether the death penalty was appropriate. There was no reason for the state to contest the evidence of retardation introduced at the mitigation hearing because that evidence did not link Hill’s alleged retardation with his culpability for the murder of Raymond Fife. , Without this connection the fact that Hill might be mentally retarded was not particularly relevant to whether Hill could be executed.”
177 Ohio App.3d at 184, 894 N.E.2d at 118. The Ohio Court holding is consistent with our Supreme Court’s decision in Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d-(Ala.2007):
“In the context of an Atkins [v. Virginia, 536 U.S. 304 (2002) ] claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded and thus ineligible for the death penalty. See Morrow v. State, 928 So.2d 315, 323 (Ala.Crim.App.2004); see also Holladay v. Campbell, 463 F.Supp.2d 1324, 1341. n. 21 (N.D.Ala.2006) (interpreting Alabama law to require that the defendant prove mental retardation by. a preponderance of the evidence). Therefore, it is certainly possible for a court to conclude that a defendant has met his burden of proving mild mental retardation as a mitigating circumstance but, at the same time, to conclude that the defendant has not carried' the burden of proving mental retardation for purposes of an Atkins claim.”
— So.3d at —-. The doctrine of collateral estoppel does not bar our review of this issue. The circuit court’s finding in its sentencing order that Dunaway was mentally retarded is not dispositive of whether Dunaway’s sentence of death is constitutionally barred because of his mental deficiency.
Dunaway asserts that he is mentally retarded and that under the United States Supreme Court’s decision in Atkins v. Virginia, 536 U.S., 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. .(2002), his sentence of death violates the United States Constitution.
*562 In regard to this claim, the circuit court stated:
“Dunaway relies primarily on the testimony of Dr. Fernando Lopez, his psychiatric expert at trial to support this argument. The trial court considered the testimony of Dr. Lopez, together with the testimony from other witnesses, to determine whether any non-statutory mitigating circumstances, under Section 13A-5-52 of the' Code of Alabama (1975), existed.' The jury, by its guilt-phase verdict, and the trial court, by its sentence, rejected Lopez’s testimony that Dunaway suffered from a severe mental disease or defect at the time he murdered James Patterson. Therefore, Dunaway’s contention that the trial court ‘made a determination’ he is mentally retarded is without merit. Rule 32.7(d), Ala. R.Crim. P.
“Based on evidence from Dunaway’s trial and evidence presented at his evi-dentiary hearing, this Court finds that Dunaway is not mentally retarded. A review of' Dunaway’s trial testimony shows he was clear and articulate on the stand, even during a vigorous cross-examination by the prosecutor. See Clisby v. State of Alabama, 26 F.3d 1054, 1056 (11th Cir.1994) (holding that dishy's trial testimony ‘[gave] the judge an opportunity to gauge roughly [dishy’s] intelligence’). Dunaway admitted he made up an alibi because he was scared. Dunaway also said he was able to follow directions from Don Dykes when Duna-way worked for Dykes. Dunaway admitted he took money his mother sent him to buy crack cocaine to resell to get the money necessary for him to go back to Texas. Dr, Lopez testified that, before the incident, Dunaway had scored •75 or 76 on IQ tests. At the evidentiary hearing, Dunaway’s stepmother, Angela Dunaway, testified that Dunaway came to live with her in Texas in 1996, that he attended a trade school, received a certificate in auto mechanics, and worked at an Auto World store.
“Considering the evidence at Duna-way’s trial and evidentiary hearing, the Court finds that Dunaway did not have significant subaverage intellectual functioning or significant or substantial deficits in adaptive behavior before turning 18 years old. Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002). The Court finds that Dunaway’s allegation he is mentally retarded is ' without merit. Rule 32.7(d), Ala. R.Crim. P.”
(C.R. 680-81.)
In Atkins, the United States Supreme Court held that it was a violation of the ' Eighth Amendment to the United States Constitution to execute a mentally retarded individual. The Court left it to the individual states to adopt a definition of mental retardation. Though Alabama has yet to enact any legislation addressing this issue, .the Alabama Supreme Court in Ex parte Perkins, 851 So.2d 453 (Ala. 2002), adopted the most liberal view of mental retardation followed by those states that currently bar the execution of the mentally retarded. Under Perkins, to be considered mentally retarded for Atkins purposes, the defendant must have: (1) significant subaverage intellectual functioning, i.e., an IQ of 70 or below; (2) significant or substantial deficits in adaptive behavior; and (3) these problems must have manifested themselves during the developmental years, i.e., before the defendant reached the age of 18.
The record indicates that Dunaway was evaluated before his trial by Dr. Michael Thomas D’Errico, a forensic psychologist. Dr. D’Errico’s report stated that Dunaway functions in the “borderline to low average range of intelligence.” (Trial clerk’s record, p. 23.) Dr. D’Errico also recom *563 mended that Dunaway be further evaluated. As a result of this recommendation, counsel • moved for funds for a mental-health expert. Dr. Fernando Lopez was retained to evaluate. Dunaway. • Dr. Lopez testified that in 1993 Dunaway scored a 76 on an IQ test but that three weeks before trial he was tested again and he scored 67.
The record also indicates that after Dun-away was released from the Texas Department of Corrections he completed an automobile-mechanics program, obtained his certification, and was employed at a company as a lube technician. Dunaway also fathered á child with a female in Texas and had a'relationship with one of the victims — Tressa Patterson.' Dunaway testified in his own behalf and his testimony appeared articulate.
“In the context of an Atkins claim, the defendant has the burden, of proving by a preponderance of the evidence that he or she is mentally retarded.” Smith v. State, — So.3d at-. Dunaway did not meet this burden. The record indicates that Dunaway does not meet the definition of mental retardation adopted by the Alabama Supreme Court in Ex parte Perkins. Thus, Dunaway’s sentence of death is not constitutionally barred.
VIII.
Dunaway mext1 argües that his death sentence violates the United ■ States Supreme Court’s holding in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Edüd 435 (2000), first held that any fact which increases the statutory máximum sentence must be presented to a jury and proven beyond a reasonable doubt. This holding was extended to death-penalty cases in Ring.
First, the holding in Ring does not apply retroactively to cases on collateral review. Dunaway’s direct appeal was, final in 1999; Ring was not released until 2002. “The United States Supreme Court in Schriro v. Summerlin, 542 U.S. 848, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), specifically held that its decision in Ring did not apply to death cases that were already.final at the time, that the decision was announced.” Brooks v. State, 929 So.2d 491, 513 (Ala.Crim.App.2005).
Second, the jury was instructed that before it-could proceed to vote on whether to impose the death, penalty it must, unanimously find the existence of an aggravating circumstance. In regard to James’s death the jury recommended by a vote of 10 to 2 that Dunaway be sentenced to death. “[I]t is clear -that it unanimously found the existence of at least one aggravating circumstance.” Pilley v. State, 930 So.2d 550, 568 (Ala.Crim.App.2005). Accordingly, there-was no Ring violation in this case.
IX.
Dunaway argues that the circuit court erred in denying his Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), claims. Specifically, he argues that the State failed to disclose information about the district attorney’s relationship with prospective jurors, that it failed to produce information regarding prosecution witnesses; and that it failed to produce information that defense counsel had a conflict of interest. -
Dunaway first asserts that the circuit court should not have ruled on the merits of this issue in its final order because it had previously dismissed the Brady claim. The record indicates that in October 2003, the circuit court summarily dismissed the Brady claim. However, in January' 2004, the circuit court allowed Dunaway to file a *564 new and consolidated Rule 32 petition. In the Consolidated petition, Dunaway raised this claim and another claim that the circuit court had previously summarily dismissed. However, Dunaway presented no evidence to support this claim at the Rule 32 hearing.
The circuit court stated the following concerning this claim:
“Dunaway first contends Mr. Whigham did not disclose his past relationships with jurors [R.B.], [B.L.], [E.B.], [V.S.], and [M.B.].[8] Dunaway also contends Whigham violated Brady by lying about his reasons for striking black venire-members during a Batson hearing. Dunaway also asserts the prosecutor ‘failed to disclose evidence favorable to the defense regarding prosecution witnesses’, and ‘failed to disclose evidence that defense counsel had a conflict of interest.’
“The evidentiary hearing testimony of jurors [E.B.], [R.B.], [B.L.], and [V.S.] established beyond any doubt that their past associations with Mr. Whigham had no effect on their guilt and penalty phase deliberations. The Court finds these allegations are without merit. Rule 32.7(d), Ala. R.Crim. P.
“The Court further finds that Duna-way failed to prove his allegations that Mr. Whigham gave any false information during the Batson hearing concerning his reasons for striking black venire-members and did not disclose favorable evidence to the defense. Mr. Whigham was not called to testify at the evidentia-ry hearing and there is nothing in the trial record raising the slightest inference these - allegations: have any merit. Further, nothing was admitted at the evidentiary hearing establishing Mr.
Whigham did not fully comply with the disclosure requirements established in Brady v. Maryland. Rule 32.7(d), Ala. R.Crim. P.
“Finally, Dunaway’s contention Whig-ham did not disclose one of Dunaway’s defense counsel had a conflict of interest is meritless. There was absolutely no evidence presented at the evidentiary hearing that Whigham knew Mr. Brun-son represented Don Dykes or Marcus Russaw. As the District Attorney for Barbour and Bullock Counties, Mr. Whigham was the lead prosecutor of thousands of criminal cases and could not be expected to-remember what.attorney represented each defendant. The Court finds this allegation is without merit. Rule 32.7(d), Ala. R.Crim. P.”
(C.R. 673-74.) We agree with, the circuit court. Dunaway failed to meet his burden of proof in regard to this claim; thus, he was due no relief.
X.
Dunaway argues that Alabama’s method of execution is unconstitutional; thus, he argues, his death sentence constitutes cruel and unusual punishment.
This claim was not presented in Duna-way’s consolidated Rule 32 petition; therefore, it is not properly before this Court. “An appellant cannot raise an issue from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.” Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997).
XI.
The circuit court correctly found that the following issues were procedurally barred in this Rule 32 proceeding. ,.
*565 1) That the circuit court allowed hearsay evidence to be presented at the penalty-phase hearing;
2) That the circuit court erroneously allowed the jury to consider bullets that were collected from the toilet in a holding cell where Dunaway was incarcerated;
3) That Dunaway’s jury venire was un-derrepresentative of African-Americans;
4) That the circuit court erroneously denied Dunaway’s motions for individual voir dire and for a change of venue;-
5) That the prosecutor engaged in pros-ecutorial misconduct;
6) That Dunaway was improperly tried in handcuffs; and
7) That the circuit court erred in considering inadmissible evidence concerning the aggravating circumstance that the murder was especially heinous, atrocious, or cruel.
We agree with the circuit court that these claims were procedurally barred under Rules 32.2(a)(2), Ala. R.Crim. P.
XII.
Dunaway next argues that the circuit court erred in denying several of his motions. Specifically, he argues that his motion for funds for expert assistance and his discovery motion should have been granted.
“Because the law is clear- that Rule 32 petitioners are not entitled to funds to hire experts to assist in postcon-viction litigation, ex parte or otherwise, the trial court did not err in denying the motion. Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003).” Johnson v. State, [Ms. CR-05-1805, September 28, 2007] — So.3d-,-(Ala.Crim.App.2007).
Dunaway also argues that the circuit court erred in not allowing him discovery of the district attorney’s' private-practice case files on the jurors he had represented while he was in private practice.
The record indicates that counsel requested discovery of the district attorney’s files related to the jurors he asserted had failed to disclose their relationship to the district attorney. (C.R. 88.) He asserts in his brief that if he. had had access to the files he would have “been able to present all of the facts about the prior relationships.” .(Dunaway’s brief at page 117.)
In Ex parte Land, 775 So.2d 847 (Ala.2000), the Alabama Supreme Court held that to be entitled to discovery in a post-conviction proceeding, the petitioner must show “good cause.” The Court stated:
“We agree with the Court of Criminal Appeals that ‘good cause’ is the appropriate standard by which to judge post-conviction discovery motions. . In fact, other courts have adopted a similar ‘good-cause’ or ‘good-reason’ standard for the postconviction discovery process. See [State v.] Marshall, [148 N.J. 89, 690 A.2d 1 (1997) ]; State v. Lewis, 656 So.2d 1248 (Fla.1994); People ex rel. Daley v. Fitzgerald, 123 Ill.2d 175, 121 Ill.Dec. 937, 526 N.E.2d 131 (1988). As noted by the Illinois Supreme Court, the good-cause standard guards against potential abuse of the postconviction discovery process. See Fitzgerald, supra, 123 Ill.2d at 183, 121 Ill.Dec. 937, 526 N.E.2d at 135. We also agree that New Jersey’s Marshall case provides a good working framework for reviewing discovery motions and orders in capital cases. In addition, we are bound by our own rule that ‘an evidentiary hearing must be held on a [petition for postcon-viction relief! which is meritorious on its face, i.e., one which contains matters and allegations (such as ineffective assistance of counsel) which, if true, entitle *566 the- petitioner to relief.’ Ex parte Boatmight, 471 So.2d 1257, 1258 (Ala.1985).
“We emphasize that this holding— that postconviction discovery motions are to be judged by a good-cause standard — doe's not automatically allow discovery under Rule 32, Ala. R.Crim. P., and that it does not expand the discovery procedures within Rule 32.4. Accord Lewis, supra, 656 So.2d at 1250, wherein the Florida Supreme Court stated that the good-cause standard did not affect Florida’s rules relating to postconviction procedure, which are similar to ours. By adopting this standard, we are only recognizing that a trial court, upon a petitioner’s showing of good cause, may exercise its inherent authority to order discovery in a proceeding for postconviction relief. In addition, we caution that 'postconviction discovery does not provide a petitioner with a right to ‘fish’ through official files and that it ‘is not a device for investigating possible claims, but a means of vindicating actual claims.’ People v. Gonzalez, 51 Cal.3d 1179, 1260, 800 P.2d 1159, 1206, 275 Cal.Rptr. 729, 776 (1990), cert. denied, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 85 (1991). Instead, in order to obtain discovery, a petitioner must allege facts that, if proved, would entitle him to relief. Cf. Porter v. Wainwright, 805 F.2d 930, 933 (11th Cir.1986) (‘a hearing- [on a habeas corpus petition] is not required unless the petitioner alleges facts which, if proved, would entitle him to federal habeas, relief), cert. denied, 482 U.S. 918, 919, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987), Furthermore, a petitioner seeking postconviction discovery also must meet the requirements of •Rule , 32.6(b), Ala. R.,Crim. P,, which states:, • ,
“ ‘The petition must contain a clear and .specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.’
“That having been said, we -must determine whether Land presented the trial court with good cause for ordering the requested discovery. To do that, we must evaluate Land’s basis for the relief requested in his postconviction petition and determine whether his claims are facially meritorious. Only after making that examination and determination can we determine whether Land has shown good cause.”
775 So.2d at 8.52-53 (footnote omitted).
This Court ■ has held that a petitioner fails to show good cause when the information is available through less intrusive sources. See State v. Turner, 976 So.2d 508 (Ala.Crim.App.2007). This information was available through the jurors themselves. Dunaway could easily have questioned the jurors about their relationships with the district attorney. Accordingly, the circuit court did not err in denying discovery on this ground.
Dunaway also argues that the circuit court should have granted him discovery of his institutional records. In Ex parte Turner, 2 So.3d 806 (Ala.2008), the Supreme Court held that the petitioner 'failed to show good cause for discovery of institutional records when the same information could have been provided through the testimony of one of the jailers.
“[W]e agree with the Court of Criminal Appeals and with the State that [the petitioner] has not demonstrated good cause for the Limestone County jail records, because he has not demonstrated that [the jailer’s] testimony would be an insufficient alternative source for the in *567 formation necessary to vindicate the claim related to those records.”
2 So.3d at 817. Dunaway failed to show good cause for this information. Thus, the circuit court did not err in denying this discovery request. See Turner, supra.
For the reasons stated above, we affirm the circuit court’s denial of Dunaway’s Rule 32 petition.
AFFIRMED.
WISE, P.J., and WELCH and MAIN, JJ., concur.
WINDOM, J., concurs in the result.

. This case was originally assigned to another judge on the Court of Criminal Appeals; it was reassigned to Judge Kellum on May 5, 2009.

. Initials are used to protect the anonymity of the jurors.

. This Court may take judicial notice of its records in Dunaway's direct appeal. See Net-ties v. State, 731 So.2d 626 (Ala.Crim.App.1998).

. Brunson and McKinnon. also represented 'Dunaway on direct appeal.

. In this section of Dunaway's brief he also argues that the circuit' court's order is erroneous for several different reasons. In most of the instances Dunaway does not identify what portion of the order he is challenging. In other instances, the circuit court gave alternative grounds for denying relief,-and he challenges only one of those grounds. Also, these *555 issues are addressed in other sections of this opinion.

. The record indicates that counsel did file a motion to suppress Dunaway’s statement to police on the grounds that the confession was coerced.

. " 'Collateral estoppel' is an awkward phrase, but it stands for an extremely, important principle in our adversary system of justice. • It means simply' that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit....” Ashe v. Swenson, 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

. On appeal, Dunaway does not raise issues concerning all of the jurors that he challenged in his Rule 32 petition.